SOUTH CAROLINA ELECTRIC &
GAS COMPANY, Plaintiff,

v.

WESTINGHOUSE ELECTRIC
CORPORATION,
Defendant.

DUKE POWER COMPANY, Plaintiff,

v.

WESTINGHOUSE ELECTRIC
CORPORATION,
Defendant.

CAROLINA POWER & LIGHT
COMPANY, Plaintiff,

v.

WESTINGHOUSE ELECTRIC
CORPORATION,
Defendant.

Civ. A. Nos. 2:90–0598–1, 2:90–
0599–1 and 2:90–0636–01.

United States District Court,
D. South Carolina,
Charleston Division.

Feb. 8, 1993.

Randolph Reed Mahan, Edward C. Roberts, South Carolina Elec. & Gas Co., Harold Simmons Tate, Jr., Sinkler & Boyd, P.A., Columbia, SC, Ray S. Bolze, Howrey & Simon, Charles J. Engel, Washington, DC, P.T. Smith, South Carolina Elec. & Gas Co., Columbia, SC, for SCE & G.

W. Edward Poe, Jr., S.C. Griffith, Jr., Duke Power Co., Charlotte, NC, John C. Pierce, Margaret H. Fitzsimmons, John G. Calendar, Washington, DC, for Duke Power Co. in No. 90–CV–598.

William F. Austin, Sr., Columbia, SC, John H. O'Neill, Jr., Shaw Pittman Potts & Trowbridge, Washington, DC, Richard E. Jones, H. Ray Starling, Jr., Carolina Power & Light

Co., Raleigh, NC, Russell H. Putnam, Jr., Tyler, Cassell & Jackson, Columbia, SC, for Carolina Power & Light Co.

James Matthew Dillon, Young, Clement, Rivers & Tisdale, John Hamilton Smith, Timothy William Bouch, Young, Clement, Rivers & Tisdale, Michael A. Molony, Charleston, SC, Thomas S. Tisdale, Jr., Young, Clement, Rivers & Tisdale, Charleston, SC, James W. Quinn, Mindy J. Spector, Weil, Gotshal & Manges, New York City, Russell H. Putnam, Jr., Tyler, Cassell & Jackson, Columbia, SC, Robert Kaufmann, Westinghouse Corp., Pittsburgh, PA, Kevin P. Hughes, Weil, Gotshal & Manges, New York City, Scott Blake, Pittsburgh, PA, for Westinghouse Elec.

Steve Campbell Griffith, Jr., W. Edward Poe, Jr., Paul Robert Newton, Duke Power Co., Charlotte, NC, Harold Simmons Tate, Jr., Sinkler & Boyd, P.A., Columbia, SC, Ray S. Bolze, Robert J. Brookhiser, P. Todd Mullins, Howrey & Simon, Washington, DC, John C. Pierce, Yvette Benguerel, James M. Lamberth, Margaret H. Fitzsimmons, John G. Calendar, Washington, DC, for Duke Power Co. in No. 90–CV–599.

Morris D. Rosen, Charleston, SC, Randall M. Roden, Thomas J. Bolch, Raleigh, NC, Wallace E. Brand, Brand & Leckie, Washington, DC, for North Carolina Elec. Membership Corp.

Robert Watson Foster, Jr., Nelson, Mullins, Riley & Scarborough, Charleston, SC, Douglas M. Martin, Poyner & Spruill, Charlotte, NC, Robert Monroe Erwin, Jr., Nelson, Mullins, Riley & Scarborough, Myrtle Beach, SC, for North Carolina Mun. Power Agency Number 1 and Piedmont Mun. Power Agency.

Thomas J. Keaveny, II, Holmes & Thomson, Charleston, SC, Wade H. Logan, III, Holmes & Thomson, Charleston, SC, John T. Nesser, III, Elizabeth S. Wheeler, Liane King Hinrichs, New Orleans, LA, for Babcock & Wilcox Industries, Ltd.

Richard Ashby Farrier, Jr., Nelson, Mullins, Riley & Scarborough, John Hamilton Smith, Young, Clement, Rivers & Tisdale, Timothy William Bouch, Thomas S. Tisdale, Jr., Young, Clement, Rivers & Tisdale, Charleston, SC, James W. Quinn, Mindy J. Spector, Weil, Gotshal & Manges, New York City, Robert Kaufmann, Westinghouse Corp., Pittsburgh, PA, Kevin P. Hughes, Weil, Gotshal & Manges, New York City, Scott Blake, Pittsburgh, PA, for Westinghouse Elec. in No. 90–CV–599.

William F. Austin, Sr., Columbia, SC, Ray S. Bolze, Howrey & Simon, Charles J. Engel, Washington, DC, Russell H. Putnam, Jr., Tyler, Cassell & Jackson, Columbia, SC, for Carolina Power & Light Co. in No. 90–CV–636.

## ORDER

HAWKINS, Chief Judge.

This matter is before the court on Defendant Westinghouse Electric Corporation's ("Westinghouse") motions to dismiss certain claims in the amended complaints filed by South Carolina Electric and Gas Company (SCE & G), Duke Power Company (Duke), and Carolina Power and Light Company (CP & L). The suits were brought under the diversity jurisdiction [1] of this court and under 28 U.S.C. § 1331 for the injuries arising under federal claims based on 18 U.S.C. §§ 1961–1964.

The underlying suits brought by SCE & G, CP & L, and Duke against Westinghouse have been consolidated for consideration by this court. Plaintiffs seek to recover damages for contract and tort claims related to the purchase of a nuclear power plant system known as the Nuclear Steam Supply System (NSSS) and for violations of the Racketeer Influenced and Corrupt Organizations Act (RICO).

Plaintiffs claim that the NSSS failed as a result of a corrosion problem and that the system failure shortened the operating life of the nuclear power plants. Plaintiffs further allege that Westinghouse knew of the corrosion problem and misrepresented the durability of the system to plaintiffs and to oth-

---

1. Westinghouse is a Pennsylvania corporation. Duke and CP & L are North Carolina corporations and SCE & G is a South Carolina corpora-
tion. The matter in controversy exceeds $50,-000. 28 U.S.C. § 1332.

ers. Plaintiffs allege that they relied on Westinghouse's representations that the systems were viable for forty years.

The contracts for the equipment and the installation of the equipment were entered into in the late 1960's and the early 1970's. Plaintiffs seek repair and replacement of the equipment, actual and consequential damages, punitive damages on certain counts of fraud, and treble damages as available by statute. They also seek to recover court costs and attorneys fees as provided by deceptive trade practices statutes.

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, Westinghouse moves to dismiss Counts I, III, IV, V, VIII, IX, and X of the Duke Amended Complaint; Counts I, III, IV, V, VII, X, XI, and XII of the SCE & G Amended Complaint; and, Counts I, II, III, V, VII, VIII, and IX of the CP & L Amended Complaint.[2] Westinghouse submitted only one brief to support its motions to dismiss the above-enumerated causes of action in each of the three amended complaints because the allegations of the three plaintiffs are similar and in some instances are identical.

■ All plaintiffs have alleged fraudulent inducement, negligent design and manufacture, negligent misrepresentation, and RICO claims, which Westinghouse seeks to have dismissed. CP & L and Duke have also alleged claims under the North Carolina Deceptive Trade Practices Act, which are the subject of Westinghouse's motions to dismiss. Finally, SCE & G alone asserts claims for breach of contract and breach of express warranty, which Westinghouse moves to dismiss. The motions to dismiss were heard on November 4, 1991. Federal Rule of Civil Procedure 12(b)(6) permits the court to dismiss causes of action that fail to state a claim upon which relief can be granted. In the complaint, Plaintiffs are only required to make a short plain statement that will give the defendant fair notice of the claim and the grounds upon which it rests. *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). All allegations are taken as true and all reasonable inferences are drawn in favor of the plaintiffs.

CP & L entered into a written contract with Westinghouse on February 19, 1968, with an effective date of January 27, 1966, for the construction of a nuclear power plant, known as the Robinson plant, near Hartsville, S.C. The contract terms encompassed the supply of a Nuclear Steam Supply System (NSSS) to CP & L. (Hereinafter the CP & L contract will be referred to as the Robinson contract). CP & L subsequently entered into a written "Tolling Agreement" with Westinghouse which allegedly provides that any statute of limitations, statute of repose, or laches, or estoppel applicable to CP & L's claims arising under the Robinson contract would be tolled between April 1, 1985 and March 31, 1986. CP & L further alleges that by subsequent amendments to the Tolling Agreement, the tolling period was extended to March 31, 1990. The Robinson plant began commercial operation in March of 1971.

SCE & G and Westinghouse entered into a written contract dated June 4, 1973, but effective December 18, 1970, for the sale and purchase of an NSSS and related services for an SCE & G site known as the Summer Plant. (Hereinafter the SCE & G contract will be referred to as the Summer contract). The plant began commercial operation on June 10, 1983.

Duke purchased two NSSS systems from Westinghouse for its McGuire plant, located in North Carolina, by contract dated January 30, 1970 (McGuire contract). The McGuire contract provided Duke with an option to purchase two additional NSSS systems for Duke's Catawba plant located in South Carolina. Pursuant to the option, Duke purchased the additional NSSS systems for the Catawba plant by contract dated January 25, 1975 (Catawba contract). The two McGuire units began commercial operation in December 1981 and March 1984, respectively. The Catawba units began commercial operation in June 1985 and August 1986, respectively.

---

**2.** Identification of the cause of action alleged by count number in each of the three plaintiff's complaints is attached as Appendix A.

SCE & G is the only plaintiff alleging a breach of express warranty. Specifically, SCE & G relies on Article V of the Summer contract. *See,* Westinghouse Mot. to Dismiss, App. A, Part D, the Summer contract. The warranty provides that the equipment furnished under the contract "will be free from defects in workmanship and material and will be suitable for operation as part of the NSSS sold hereunder." *Id.,* p. 9.

Westinghouse moves to dismiss this breach of express warranty claim because the warranty period expired without SCE & G having given notice to Westinghouse of any claim under the warranty. SCE & G admits that the equipment warranty expired by the terms of the contract on December 1, 1983, and admits that SCE & G did not discover and had not given notice to Westinghouse of any defect prior to that date. However, SCE & G contends that the notice period of the equipment warranty was unreasonable and unconscionable and caused the warranty clause to fail in its essential purpose because the design of the equipment prevented discovery of the defect before the expiration of the warranty period.

■ Contract terms are not generally found to be unconscionable in contracts which have been negotiated at arms-length between two sophisticated parties such as the corporate entities represented herein. *Jones Leasing, Inc. v. Gene Phillips and Associates,* 282 S.C. 327, 318 S.E.2d 31, 33 (Ct.App. 1984). However, the fact that a contract has been negotiated in a commercial setting is not dispositive on the issue of unconscionability. The Fourth Circuit Court of Appeals has held that it is the better practice for the trial court to allow the parties to present evidence on the circumstances surrounding the contract negotiations before resolving the question of unconscionability, whether in connection with a motion for summary judgment or at trial. *Carlson v. General Motors Corporation,* 883 F.2d 287, 293 (4th Cir.1989).

■ In the Fourth Circuit, the trial court must consider the nature of the injuries suffered by the plaintiff; whether the plaintiff is a substantial business concern; any relative disparity in the parties' bargaining power; the parties' relative sophistication; whether there is an element of surprise in the inclusion of the challenged clause; and the conspicuousness of the clause. The bare pleadings in this suit do not fully educate the court on the circumstances surrounding the contract negotiations; therefore, the court cannot decide whether the contract terms are unconscionable at this stage of the proceedings.

SCE & G, also without joinder by the other plaintiffs, alleges a breach of contract for failure to deliver conforming goods for two reasons. First, SCE & G contends that Westinghouse warranted goods that had a design-life of forty years and that because these NSSS systems do not have such a design-life, Westinghouse failed to deliver conforming goods. Though there is no express clause in the contract that asserts that the NSSS will last for forty years, SCE & G argues that the phrase "suitable for operation as part of the NSSS sold hereunder" means that the steam generator would last for forty years because that is the life of the plant.

Second, SCE & G contends that the Technical Description of the NSSS is a separate and express Maintenance Warranty. The Technical Description states that the steam generators do not require periodic preventive maintenance other than assuring proper water chemistry. According to SCE & G, the steam generators delivered require maintenance far in excess and contrary to those requirements stated; thus, the goods delivered fail to conform.

Westinghouse counters that the language regarding suitability is merely descriptive of the NSSS, and is not a warranty. There is an express warranty disclaimer in the contract and Westinghouse further argues that the statement, if construed as a warranty, is subsumed by the express warranty in Article V of the Summer Contract. Alternatively, Westinghouse declares that SCE & G's assertion of this language as a warranty is an assertion of a warranty of future performance. In support, Westinghouse cites numerous cases in which courts have found that a contract must explicitly state any warranty of future performance. SCE & G counters

that the promise to provide equipment that would meet the forty-year design life of the plant is a promise of present performance, i.e., a promise to deliver goods now that are designed to perform for forty years, not a promise of future performance.

Westinghouse further asserts that if the Technical Description language is construed as a warranty, it is subject to the same notice provision as the performance warranty. Again, Westinghouse urges that this claim be dismissed because SCE & G did not give timely notice of defect within the warranty period.

■ The only proof required for breach of contract for failure to deliver conforming goods is the existence of the warranty, the breach by failure of the goods to conform to the warranted description and the damages caused by the breach. *First State Savings & Loan v. Phelps*, 299 S.C. 441, 385 S.E.2d 821, 825 (1989). For purposes of a 12(b)(6) motion, SCE & G has alleged sufficient facts to give notice to defendant that it asserts a claim for breach of contract for failure to supply conforming goods.

Plaintiffs have alleged claims for negligent misrepresentation and for fraud in the inducement of the contracts. Westinghouse argues that the integration clauses in the contracts bar recovery for fraudulent misrepresentation or fraud in the inducement.

■ North Carolina law recognizes that the rebuttable presumption created by a merger or integration clause, a clause which expresses that a contract is the totality of the parties' agreement, can be overcome upon a showing of fraud, bad faith, unconscionability, negligent omission, or mistake in fact. *Hinshaw v. Wright*, 105 N.C.App. 158, 412 S.E.2d 138, 140 (1992). Further, North Carolina law recognizes a contract as void upon a showing of fraud in the inducement. *Clifford v. River Bend Plantation, Inc.*, 312 N.C. 460, 323 S.E.2d 23 (1984). Similarly, South Carolina law recognizes an action for negligent misrepresentation "where the misrepresented fact(s) induced the plaintiff to enter a contract or business transaction." *Gilliland*

*v. Elmwood Properties*, 301 S.C. 295, 391 S.E.2d 577, at 580 (1990) (citations omitted). Also under South Carolina law, parol evidence is generally admissible to show fraud in the inducement of a writing. *Bradley v. Hullander*, 272 S.C. 6, 249 S.E.2d 486 (1978), appeal aft. remand *Bradley v. Hullander*, 277 S.C. 327, 287 S.E.2d 140 (1982). Therefore, the presence of the integration clause does not bar the claims for negligent misrepresentation and fraudulent inducement.[3]

■ Westinghouse also contends that because the plaintiffs have only alleged economic harm they are barred from recovering not only for negligent misrepresentation but also for negligent manufacture and design. Plaintiffs' claims for negligent design and manufacture stem from products liability law, a body of tort law which springs from the implied warranty of a contract of sale. Negligent misrepresentation claims, recognized by both South Carolina and North Carolina law, are claims that may arise when misrepresentations are made by a party with a pecuniary interest in the outcome of a transaction.

■ Westinghouse cites *East River Steamship Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986) as cause to deny plaintiffs' claims for negligent misrepresentation and negligent design and manufacture of the NSSS. In *East River*, the United States Supreme Court discusses the impropriety of utilizing tort recovery for purely economic loss in a suit between two commercial enterprises when the transaction is governed by a contract. Generally, the economic loss rule states that there is no tort liability for a product defect if the damage suffered by a plaintiff is only damage to the product itself. See, *Kershaw County Bd. of Educ. v. U.S. Gypsum*, 302 S.C. 390, 396 S.E.2d 369 (1990).

Plaintiffs rely on *Greenville v. W.R. Grace & Co.*, 827 F.2d 975 (4th Cir.1987), to refute the applicability of the *East River* case to their negligence claims. Plaintiffs' reliance on *Greenville* to sustain the claims for negligent design and manufacture is misplaced.

---

**3.** According to Plaintiffs' Joint Memorandum in Opposition to Westinghouse's Motion to Dismiss, there is no merger clause in the Robinson contract.

*Greenville,* like *Kershaw County Bd. of Educ. v. U.S. Gypsum, supra,* was decided within the unique realm of asbestos-litigation created law.

In *Greenville,* the Fourth Circuit Court of Appeals opined that the South Carolina Supreme Court would permit recovery in tort regarding the use and installation of asbestos insulation in buildings. Later, in *Kershaw,* the South Carolina court did permit recovery for property damage caused by the installation of asbestos.

Asbestos is a product that releases harmful toxic fibers into the air and was the subject defective product in *Greenville.* The severity of lung irritation, caused by the inhalation of asbestos fibers, manifests itself in those exposed to the fibers after some period of exposure. In *Greenville* there were prospective damages from the product defect that had not yet manifested themselves in the form of actual personal injuries to those exposed to the product; moreover, asbestos is, in and of itself, toxic and causes harm to the public merely by exposure to the defective product. The installation of the asbestos resulted in a building contaminated by the very presence of asbestos. As a result, the City of Greenville was able to show property damage to its building, not merely damage to the product itself. Accord, *Kershaw Cty. Bd. of Educ.,* 302 S.C. 390, 396 S.E.2d 369, 371 (1990).

> The focus of [*Greenville* ] is not that the building owner has suffered an intangible economic loss, but that the asbestos-containing materials have contaminated the building, damaging property and posing a continual hazard to building occupants and workmen.

*Greenville v. W.R. Grace & Co.,* 640 F.Supp. 559, at 564 (D.S.C.1986).

 The Plaintiffs herein have not alleged that any radioactive leakage took place as a result of the defective product or that any other property was damaged. Plaintiffs only contend that the product purchased does not perform as promised and in order to prevent future harm, the systems must be replaced. In the event the nuclear reactor system fails, there is a potential for public harm, not as a result of any public exposure to the NSSS but for the potential exposure to radioactive products and by-products. The NSSS may need repair or replacement but there are no allegations that the defective product, the NSSS, has caused any latent personal injuries or that it is toxic standing alone.

In the case at bar, unlike *Greenville,* the plaintiffs' damages are the pure economic loss of having to replace product, the NSSS. Therefore, this court concludes that the economic loss rule does bar recovery for the plaintiffs' negligent design and manufacture causes of action, which can be remedied in contract. Accordingly, SCE & G Count VII, Duke Count IV, and CP & L Count III should be dismissed for failure to state a claim upon which relief can be granted.

However, there is no real precedent in South Carolina or North Carolina to support the assertion that because the plaintiffs seek recovery for economic loss alone they cannot recover under theories of negligent misrepresentation; nor, is there any support for the converse. The South Carolina Supreme Court in *Kershaw County Bd. of Educ.* declined the opportunity to definitively answer whether the economic loss rule should be rejected in all contexts, including the commercial arena. 396 S.E.2d at 371. So far, South Carolina has only rejected the rule in the homebuyer context, permitting a cause of action in negligence against a builder for economic losses in certain limited circumstances, but has expressly reserved the economic loss rule where duties are created *solely* by contract. *Kennedy v. Columbia Lumber & Mfg. Co.,* 299 S.C. 335, 384 S.E.2d 730 (1989) (emphasis in original).

 Negligent misrepresentation as stated in the Restatement (Second) of Torts § 552(1) provides a duty for information negligently supplied for the guidance of others in their business transactions. Accord, *Lesser v. William Holliday Cord Associates, Inc.,* 349 F.2d 490, 493 nn. 4 and 5 (8th Cir.1965) (action for misrepresentation by insurance agency that performance bond had been secured); *Sundance Cruises v. American Bureau of Shipping,* 799 F.Supp. 363, 381 (S.D.N.Y.1992) (action for misrepresentation

as to safety of sailing vessel). In South Carolina and North Carolina, there is a cause of action in tort for the failure to exercise reasonable care in giving information when the defendant has a pecuniary interest in the transaction. *Winburn v. Insurance Co.,* 287 S.C. 435, 441, 339 S.E.2d 142, 146 (Ct.App. 1985) (claim of misrepresentation of information regarding competency of mechanic); see also, *Forbes v. Par Ten Group, Inc.,* 99 N.C.App. 587, 394 S.E.2d 643 (1990) (claim of misrepresentation of information regarding escrow of funds).

▉▉▉▉▉ The economic loss rule is founded on the theory that parties to a contract may allocate their risks by agreement and do not need the special protections of tort law to recover for damages caused by a breach of the contract. *East River Steamship v. TransAmerica Delaval,* 476 U.S. 858, 872–874, 106 S.Ct. 2295, 2303, 90 L.Ed.2d 865 (1986). Parties to a contract for the sale of a product can include a remedy for misrepresentation in their agreement.

Most courts which have rejected the economic loss rule in negligent misrepresentation cases have limited recovery to a misrepresentation in giving information by someone hired to advise. The Illinois courts[4] have specifically limited recovery of economic losses in negligent misrepresentation actions to situations in which one is in the business of supplying information for the guidance of others in their business transactions, thus limiting such tort actions to the "sale" of information, not products. *See e.g., Moorman Mfg. Co. v. National Tank Co.,* 91 Ill.2d 69, 61 Ill.Dec. 746, 755, 435 N.E.2d 443, 452 (1982). Similarly, securities law permits recovery for economic losses for misrepresentation in giving information to investors. *See e.g., In Re Delmarva Secur. Litigation,* 794 F.Supp. 1293 (D.Del.1992).

▉▉▉ In *Laurens Elec. Co-op., Inc. v. Altec Industries, Inc.,* 889 F.2d 1323 (4th Cir. 1989), the Fourth Circuit Court of Appeals predicted that the South Carolina Supreme Court would find the holding of *East River* to be persuasive on the applicability of the economic loss rule to a negligence action for a product defect in a transaction governed by a commercial contract. Nonetheless, without specific holdings by either the highest court of South Carolina or North Carolina, this court must predict whether those courts would apply the economic loss rule as a bar to recovery for negligent misrepresentation in this case.

One factor to be considered is that the parties herein are business sophisticates and are more capable of protecting themselves by contractual agreement than an unsophisticated consumer who is party to a sales contract. Furthermore, it would be more compelling reason to raise the bar of the economic loss rule if the cause of action concerned was for fraud with its concomitant element of an actual intent to deceive. Also to be noted is the fact that though there is a great potential for harm caused by product failure in the nuclear power industry, in this case there is only damage to the product itself.

A slight change of the facts might have added just enough pressure to open the floodgate that would send contract law drowning in a sea of tort. *See, East River,* 476 U.S. at 866–868, 106 S.Ct. at 2300. However, this court concludes that in this situation—a commercial transaction governed by a contract where the loss alleged is purely economic and the cause of action is for mere negligent misrepresentation—the economic loss rule bars recovery for losses that have occurred from the product's failure to live up to the purchasers' expectations. *Accord, Miller's Bottled Gas, Inc. v. Borg–Warner Corp.,* 955 F.2d 1043, 1049 (6th Cir.1992); *Cincinnati Gas & Elec. Co. v. General Elec. Co.,* 656 F.Supp. 49, 60, 62 (S.D.Ohio 1986). Therefore, plaintiffs' claims for negligent misrepresentation must be dismissed.

Plaintiffs have alleged violations of the Racketeer Influenced Organizations Act under 18 U.S.C. §§ 1962(a), (b) and (c). Section 1962(a) prohibits any person who has received income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal, to use or invest directly or indirectly

---

**4.** Illinois is one of the few jurisdictions with a plethora of cases on the subject.

any part of such income, or its proceeds, in acquisition of any interest in any enterprise which is engaged in interstate or foreign commerce. Under 18 U.S.C. § 1962(b) it is unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly any interest in, or control of, any enterprise which is engaged in or the activities of which affect interstate or foreign commerce. Finally, under 18 U.S.C. § 1962(c) it is unlawful for any person employed or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activities or collection of unlawful debt. Westinghouse asserts that Plaintiffs have failed to adequately plead RICO violations under any of the three subsections of 18 U.S.C. § 1962.

In *United States v. Griffin,* 660 F.2d 996 (4th Cir.1981), the Fourth Circuit Court of Appeals enumerated the essential elements of a substantive § 1962(c) violation in a criminal prosecution: (1) employment by or association of a defendant with (2) an "enterprise" (3) engaged in or affecting interstate commerce (4) the affairs of which are conducted by or participated in by the defendant through a pattern of racketeering activity. *Id.* at 999. In addition to those substantive elements, plaintiffs must show that they were injured by the defendant's violation of RICO to recover damages in a civil suit.

Plaintiffs have alleged that Westinghouse is a "person", under 18 U.S.C. § 1961(3), as are certain employees of Westinghouse "persons" and Westinghouse International, a wholly owned subsidiary of Westinghouse. Plaintiffs contend that these "persons" were employed by or associated with at least one of three alleged "enterprises." 18 U.S.C. § 1961(3) and (4). The enterprises were each engaged in, or the activities of affected, interstate commerce.

The first enterprise alleged is the "nuclear power plant" or "project" enterprise. Duke, SCE & G and CP & L, each state that it, with other entities and individuals, comprises an on-going association-in-fact. These associations-in-fact function as organizations for the purpose of planning, constructing and placing into commercial operation the nuclear power plants, i.e., for Duke, the Catawba and McGuire plants; for SCE & G, the Summer plant; and, for CP & L, the Robinson plant. Plaintiffs assert that each of these organizations is an "enterprise" whose activities affect interstate commerce.

The amended complaints charge the existence of a second "enterprise" that is comprised of Westinghouse, its subsidiaries, employees and affiliates, including International Nickel with whom Westinghouse contracted to supply goods and services to nuclear power plant owners. Together these parties function as an on-going association-in-fact, termed "the nuclear suppliers" enterprise. The plaintiffs contend that this association-in-fact functions as a unit for the common purpose of obtaining money and property by participating in the design and construction of, and the supply of materials to, various nuclear facilities worldwide, including the power plants of these plaintiffs.

As a third enterprise plaintiffs allege another association-in-fact, which plaintiffs call the "owners group". It is comprised of various utility companies and Westinghouse and is managed by the Electric Power Research Institute (EPRI). Allegedly, the "owners group" functions as a unit for the common purpose of examining and studying problems with steam generators.

Westinghouse counters that plaintiffs have failed to adequately plead any RICO enterprise. Westinghouse insists that plaintiffs' allegations that the utility projects, the nuclear suppliers, and the owners group are enterprises are insufficient under the law as espoused in *United States v. Turkette,* 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981).

> Proof of the existence of an associated-in-fact enterprise requires proof of a "common purpose" animating its associates, and this may be done by evidence of an "ongoing organization, formal or informal," of those associates in which they function as a continuing unit.

*U.S. v. Griffin,* 660 F.2d at 1000 (4th Cir. 1981) (citations omitted).

■ In a Rule 12(b)(6) motion, the allegations are taken as true. Plaintiffs have alleged that each of these "enterprises" is associated for a common purpose which is separate and distinct from the pattern of racketeering activity engaged in by Westinghouse and its affiliates. These allegations meet the threshold test of *Turkette* and of the Fourth Circuit precedent *United States v. Love*, 767 F.2d 1052, 1061 n. 13 (4th Cir.1985), *cert. denied*, 474 U.S. 1081, 106 S.Ct. 848, 88 L.Ed.2d 890 (1986), a case which was cited for support by Westinghouse.

According to the amended complaint, Westinghouse conducted or participated in the affairs of the enterprises; i.e., the power plants, the nuclear suppliers, and the owners group; through one or more patterns of racketeering activity. "Racketeering activity" is defined in 18 U.S.C. § 1961(1) to mean among other things, any act which is indictable under certain listed provisions of Title 18 of the United States Code, including mail fraud or wire fraud.

Plaintiffs allege that from 1968 to the present Westinghouse engaged in a pattern of fraudulent acts against the plaintiffs involving use of the mails and telephones to transmit repeated misrepresentations and material non-disclosures regarding the performance of the NSSS in furtherance of Westinghouse's fraudulent schemes. The three schemes alleged are: a scheme to induce plaintiffs to accept Westinghouse's allegedly deficient performance under the contracts and to continue to make payments to Westinghouse under the contracts without demanding that Westinghouse deliver steam generators capable of operating for their design-life; a scheme to induce plaintiffs to forego or delay taking remedial measures and asserting their rights; and, a scheme to induce plaintiffs to invest funds in costly efforts to maintain water chemistry, knowing water chemistry was not the cause of the defect. Enumerated paragraphs of the plaintiffs' amended complaint set forth in detail the facts which the plaintiffs maintain were known to Westinghouse and material to plaintiffs' decisions to contract with Westinghouse but which were not disclosed by Westinghouse. Plaintiffs specify that these fraudulent acts involved repeated mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), inducement to interstate travel (18 U.S.C. § 2314) and receipt of converted property (18 U.S.C. § 2315). Plaintiffs' allegations of acts constituting a "pattern of racketeering activity" are sufficient to withstand the scrutiny of a 12(b)(6) motion.

To allege a violation of 18 U.S.C. § 1962(c), plaintiffs must allege that the defendant conducted the affairs of the alleged enterprise through a pattern of racketeering activity. *United States v. Webster*, 669 F.2d 185 (4th Cir.1982), *cert. denied*, 456 U.S. 935, 102 S.Ct. 1991, 72 L.Ed.2d 455 (1982). Having sufficiently alleged three different enterprises and a pattern of racketeering activity, plaintiffs must allege facts that Westinghouse "conducted" or "participated in" the affairs of each enterprise through the pattern of racketeering activity.

Westinghouse asserts that the plaintiffs have not alleged facts sufficient to show that Westinghouse "conducted" or "participated in" the affairs of the three alleged enterprises through the pattern of racketeering activity. Citing language from *U.S. v. Mandel*, 591 F.2d 1347, 1375 (4th Cir.1979), *cert. denied*, 445 U.S. 961, 100 S.Ct. 1647, 64 L.Ed.2d 236 (1980), Westinghouse argues that the "conduct" or "participate" language of § 1962(c) requires some allegation of involvement in the operation or management of the business. Westinghouse also contends that plaintiffs have failed to demonstrate a nexus between the alleged racketeering activities and the conduct of the enterprises' affairs.

> The proper question [is] whether the affairs of [the enterprise] were *conducted* through the pattern of racketeering activity, not whether they were benefitted or advanced or whether profit to the [enterprise] resulted.

*U.S. v. Webster*, 669 F.2d at 186–187 (4th Cir.1982) (emphasis in original).

> Section 1962(c) applies when a defendant, through a pattern of racketeering activity, exercises control over or within an enterprise, participating not merely in the enterprises affairs, but in *the conduct* of the enterprise's affairs.

*Yellow Bus Lines, Inc. v. Drivers, Chauffeurs, and Helpers Local Union 639,* 913 F.2d 948, at 954 (D.C.Cir.1990) (emphasis in original).

■ "Mere participation in the predicate offenses listed in RICO, even in conjunction with a RICO enterprise, may be insufficient to support a RICO cause of action." *Bennett v. Berg,* 710 F.2d 1361 at 1364 (8th Cir.1983). Allegedly, Westinghouse "participated" in the conduct of the affairs of the McGuire and Catawba plants, the Robinson project and the Summer project, by designing, manufacturing, repairing, and supervising the installation of the NSSS and related equipment. Plaintiffs assert that Westinghouse employees were stationed at the plants during construction and that those employees repeatedly misrepresented and failed to disclose material facts thus continuing and maintaining the fraud that was being perpetrated by Westinghouse.

In their memorandum in opposition to the motions to dismiss, Plaintiffs claim that Westinghouse's supervision of the installation of the NSSS is tantamount to involvement in the operation or management of the projects. The defendant's participation in the conduct of the affairs of the enterprise ordinarily requires some participation in the operation or management of the enterprise itself. *Id.* The argument that Westinghouse's supervision of the installation of the NSSS and the construction of the power plants is the equivalent of asserting that the cement contractor who supervises the pouring of a foundation for a new school building is involved in the management or operation of the school board.

Plaintiffs' assertion that Westinghouse participated in the affairs of the utility construction projects by contracting with the utility companies to supply the nuclear steam systems and to oversee construction of the plant and installation of the NSSS is simply insufficient to show that Westinghouse participated in the conduct of the affairs of the power plant enterprises. The facts set forth only that Westinghouse was a contractor upon which plaintiffs relied as the supplier of equipment, design expertise, and supervisory expertise for a particular construction project. The plaintiffs allege only that Westinghouse duped them into purchasing inadequate machinery and plans, by professing to have expertise and a system design in the nuclear steam generation field. Plaintiffs do not allege facts that would indicate that Westinghouse, through its efforts to perpetrate its alleged fraudulent scheme of selling inadequate equipment to the utility companies, had any managerial role or participatory role in the conduct of the affairs of Duke Power, Carolina Power and Light, or South Carolina Electric and Gas, through a pattern of racketeering activity. See, *United States v. Mandel,* 591 F.2d 1347, 1375 (4th Cir. 1979). See also, *Averbach v. Rival Manufacturing Co.,* 809 F.2d 1016 (3d Cir.1987).

Westinghouse also allegedly participated in the conduct of the affairs of the Nuclear Suppliers group. Quoting from CP & L's Amended complaint:

Westinghouse participated in the Nuclear Suppliers enterprise ... in that Westinghouse and its divisions, officers, employees, its subsidiary Westinghouse International Projects Company, and affiliates and other companies, such as International Nickel Company, *supplied materials, equipment and services for nuclear power plants throughout the world,* including Robinson, McGuire, Catawba, Summer.... Westinghouse engaged in the affairs of [the nuclear suppliers] enterprise through the racketeering activities described [in the complaint]. Amended complaint para. 87(b), p. 70. (emphasis added).

There are no allegations which support the notion that Westinghouse had any managerial role over the members of the "nuclear suppliers group". However, the only goal of the nuclear suppliers group was to supply materials to purchasers of nuclear steam generation devices. Therefore, Westinghouse could reasonably be said to have "participated" in the furtherance of that goal through the alleged pattern of racketeering activities, which promoted the purchase of the NSSS. Accordingly, it is at least arguable under the facts alleged in the complaint that Westinghouse participated in the conduct of the affairs of the nuclear suppliers

enterprise through the alleged pattern of racketeering activity.

Similarly, Westinghouse allegedly participated in the "owners group" enterprise by engaging in steam generator research projects assigned by the owners group and by presenting papers on the subject at meetings of the owners group. Again, though plaintiffs have not indicated how Westinghouse may have "managed" the affairs of the owners group, the complaints certainly indicate a participation in the affairs of the owners group through the alleged racketeering activities. Plaintiffs contend that Westinghouse personnel attended meetings and symposiums on behalf of Westinghouse as a member of the "owners group" and its employees repeated the misrepresentations and continued the failure to disclose material facts concerning defects in the steam generators. If the common purpose of the "owners group" enterprise was to study steam generators and the generation of nuclear power and share its findings with those in the industry, then the allegations that Westinghouse participated in the affairs of the· enterprise is supported by the allegation that Westinghouse conducted research and presented that research at the behest of the members of the "owners group." Through Westinghouse's presentation of misleading information as a representative of the owners group it participated in the conduct of its affairs.

Therefore, the allegation that Westinghouse violated 18 U.S.C. § 1962(c) by its association with the power plant projects, must fail because the ·alleged facts do not show that Westinghouse "participated" in the conduct of the affairs of the nuclear power plant enterprises. Nonetheless, plaintiffs have alleged facts which overcome the low hurdle of a Rule 12(b)(6) on the alleged § 1962(c) enterprise violations involving the nuclear suppliers group and the owners group.

For a § 1962(b) violation, plaintiffs submit the same facts to establish "persons", "patterns" and "enterprises". A § 1962(b) violation requires that a person acquire or maintain, directly or indirectly some interest in, or control of, an enterprise through a pattern of racketeering activity.

"Interest" as used in the RICO statute has been generally held to require the acquisition of a property right of some kind in the alleged . enterprise. *U.S. v. Jacobson,* 691 F.2d 110, p. 112–113 (2d Cir.1982). "Interest" includes "all property and interests, as broadly described, which are related to the violation." *Prudential–Bache Secur. Inc. v. Cullather,* 678 F.Supp. 601, at 609 (E.D.Va. 1987) (citations omitted).

In *Moffatt Enterprises, Inc. v. Borden Inc.,* 763 F.Supp. 143 (W.D.Pa.1990), the district court discusses the focus of § 1962(b) by looking at the legislative history of the Act and by comparing case law that explains use of the word "control" in § 1962(a) violations. "Subsection (b) focuses on illegitimate acquisition with illegitimate funds.... [s]ubsection (b) focuses on illegitimate acquisition through the proscribed pattern of activity or collection of debt". *Id.,* at 147.

Plaintiffs declare that Westinghouse acquired and maintained an interest or control in the nuclear power plants projects by entering into the contracts to supply the steam generators and other NSSS equipment. Plaintiffs assert that Westinghouse continued and expanded its interest and control throughout the projects by receiving payments under the original contracts and by such contracts, Westinghouse advanced its commercial standing as a supplier of steam systems. *See e.g.,* CP & L Amended Complaint, p. 74, para. 93. Furthermore, Westinghouse allegedly acquired and maintained interest in the "nuclear suppliers" enterprise by contracting with International Nickel to supply material for the fabrication of the Inconel 600 tubing for use in the development· of nuclear systems generators. *Id.* Finally, Westinghouse allegedly acquired and maintained an interest or control in the third enterprise, the "owners group", by contracting to undertake research and to present studies and papers to the owners group. Westinghouse is said to have benefitted from the conduct of the employees who engaged in the racketeering activities, as described. Further, it is alleged that Westinghouse aided and abetted its employees' participation in the racketeering activities in violation of § 1962(b). *Id.*

Plaintiffs allegations that Westinghouse "acquired an interest in" or "maintained control of" the enterprises through a pattern of racketeering activity are not nearly as strong as the allegations which survived a motion to dismiss in *Cincinnati Gas and Electric Company v. General Electric Co.*, 656 F.Supp. 49 (S.D.Ohio 1986) or *Long Island Lighting Co. v. General Electric Co.*, 712 F.Supp. 292 (E.D.N.Y.1989), two cases upon which plaintiffs rely for support of their complaints herein. In *Cincinnati* the plaintiff had alleged that the defendant was directly involved in management and had acquired voting rights in a similarly alleged "owners group" enterprise and that the defendant had shared in the cost and obtained a proprietary right to data, reports, and analysis produced by a similarly alleged "owners group." In *Long Island Lighting Co.*, LILCO alleged that the owners group was formed and GE was made a consultant to it as a result of GE's false statements. None of plaintiffs' allegations herein suggest that Westinghouse obtained any ownership or proprietary interest in any of the three alleged enterprises.

In addition to showing that some interest or control was acquired, § 1962(b) requires that the person, Westinghouse, acquire or maintain an interest in or control of any enterprise *through a pattern of racketeering activity.* 18 U.S.C. § 1962(b). Therefore, the amended complaint must set forth allegations that Westinghouse acquired its interest in each of the three alleged enterprises through the mail fraud, wire fraud, fraudulent inducement to interstate travel, or the wrongful conversion of property.

Applying the alleged racketeering acts to the manner in which Westinghouse is said to have acquired or maintained an interest in or control of the three enterprises, the court finds that there simply is no nexus between the racketeering activities alleged and the acquisition of an interest in or the maintenance of control of the three alleged enterprises. Therefore, the court finds that none of the plaintiffs have sufficiently alleged a violation under 18 U.S.C. § 1962(b) and those causes of action should be dismissed.

The plaintiffs assert that Westinghouse also violated § 1962(a). "Subsection (a) makes it unlawful to invest funds from a pattern of racketeering activity ... in any enterprise engaged in interstate commerce. The funds must have been derived from activity in which [the defendant] participated as a principal." *Moffatt Enterprises, Inc. v. Borden, Inc.*, 763 F.Supp. at 147.

Plaintiffs' allegations as to the "persons" and "pattern" are the same. The "enterprise" into which Westinghouse reinvested the income from the racketeering activity is itself. Allegedly, Westinghouse received income from its pattern of racketeering activity in the form of sales of Westinghouse's defective steam generators and services to the utility companies.

According to plaintiffs' amended complaint, Westinghouse has reinvested the income derived from the enterprise of selling NSSS systems into the corporate operation of Westinghouse in order to perpetuate its corporate existence, to expand its operations and to facilitate its continued multiple schemes to defraud the purchasers of the steam generators.

█ Westinghouse does not specifically contest the sufficiency of plaintiffs § 1962(a) allegations. Westinghouse only contests the § 1962(a) cause of action by its arguments that the plaintiffs have not adequately pleaded RICO "enterprises". Westinghouse argues that because the plaintiffs have alleged that Westinghouse is both the offender and the enterprise that the plaintiffs have failed to state a cause of action under § 1962(a). Under § 1962(a) the enterprise alleged does not have to be distinct from the person receiving income from a pattern of racketeering activity.

In *Busby v. Crown Supply, Inc.*, 896 F.2d 833 (4th Cir.1989), the Fourth Circuit held that the enterprise and the offender may be identical. *Busby* overruled the aspect of *United States v. Computer Sciences, Corp.*, 689 F.2d 1181 (4th Cir.1982) in which the court had previously found that the enterprise must be a separate element from the pattern of racketeering activity in which the enterprise engages. The case law now suggests that under § 1962(c) the enterprise and

the offender must be separate and under § 1962(a) the two may be the same.

Duke and CP & L assert claims under N.C.Gen.St. § 75–1.1, the North Carolina Unfair Trade Practices Act. Westinghouse alleges that these are barred by a four-year statute of limitations, N.C.Gen.Stat. § 75–16.2.

 In North Carolina a cause of action accrues at the time of the invasion of the plaintiff's right. *Peal v. Martin,* 207 N.C. 106, 176 S.E. 282 (1934). If a cause of action is based in fraud, it accrues at the time the fraud is or should have been discovered. If it is based in contract, the cause of action accrues at the time of the breach. In *Nash v. Motorola Communications and Electronics, Inc.,* 96 N.C.App. 329, 385 S.E.2d 537 (1989), the court determined that an unfair trade action, which was found to be based on fraudulent misrepresentation, accrued at the time the fraud was discovered or should have been with reasonable diligence discovered. To the contrary, in *Ring Drug Co. v. Carolina Medicorp Enterprises, Inc.,* 96 N.C.App. 277, 385 S.E.2d 801, 804 (1989), the court found that a complaint under the unfair trade practices act was more akin to a breach of contract action, which accrued on date contract was terminated.

Duke and CP & L contend that they did not discover, and reasonably could not have discovered, the alleged fraudulent acts any sooner and that their claim has been brought well within the four-year statute. Moreover, Duke and CP & L argue that Westinghouse is equitably estopped from asserting the statute of limitations defense because Westinghouse's actions precluded discovery any earlier.

 Equitable estoppel arises when a party asserting the statute of limitations has caused the other party to forestall initiation of its suit. To invoke the doctrine of equitable estoppel one must prove that he reasonably relied to his detriment on the material representations of his adversary, and that his adversary knowingly misrepresented facts with the expectation that those misrepresentations would be relied upon. See, *Roth-*

*mans Tobacco Co., Ltd. v. Liggett Group, Inc.* 770 F.2d 1246, 1250 (4th Cir.1985).

 Duke and CP & L have alleged facts that sufficiently state a cause of action under the North Carolina deceptive trade practices act. Any question of equitable estoppel against Westinghouse's assertion of the statute of limitations is one of fact which cannot be decided at this stage of the proceedings. Accordingly, the claims will not be dismissed on the pleadings.

Finally, Westinghouse has moved to dismiss plaintiffs' claims for consequential damages. Westinghouse submits that the recovery of such damages is unequivocally limited by the terms of the contract. Again, this issue is one of fact to be determined by a construction of the parties' contracts and cannot be decided on the bare pleadings.

Accordingly,

IT IS ORDERED that as to SCE & G's Amended Complaint Count III for negligent misrepresentation, Count VII for negligent design and manufacture, Count X for a violation of 18 U.S.C. § 1962(c) only as to the allegations involving the alleged nuclear project enterprise, and Count XI for a violation of 18 U.S.C. 1962(b) as to each of the three alleged enterprises, the claims are dismissed.

IT IS FURTHER ORDERED that as to CP & L's Amended Complaint Count II for negligent misrepresentation, Count III for negligent design and manufacture, VII for a violation of § 1962(c) only as to the allegations involving the alleged nuclear project enterprise, and Count VIII for a violation of § 1962(b) as to each of the three alleged enterprises, the claims are dismissed.

IT IS FURTHER ORDERED that as to Duke's Amended Complaint Counts III for negligent misrepresentation, Count IV for negligent design and manufacture, Count IX for a violation of § 1962(c) only as to the allegations involving the alleged nuclear project enterprise, and Count X for a violation of § 1962(b) as to each of the three alleged enterprises, the claims are dismissed.

IT IS FURTHER ORDERED that Westinghouse's motions to dismiss as filed in each of the three cases are granted in part and

denied in part as described above for the reasons stated herein.

## APPENDIX A

| Plaintiff: | SCE & G | CP & L | DUKE |
|---|---|---|---|
| Count I | Fraud. Inducem't * | Fraud * | Fraud Inducem't * |
| Count II | Post Contrt Fraud | Negl. Misrep.* | Post Contrt Fraud |
| Count III | Negl. Misrep.* | Negl. Design. & Mnfctr * | Negl. Misrep.* |
| Count IV | Brch Express Warr'ty * | Promis'y Estop. | Negl.Desgn. & Mnfctr * |
| Count V | Brch. for Fail. to Del'vr Conform'g Gds * | NC U.T.P.A.* | NC U.T.P.A.* |
| Count VI | Brch. Duty Gd. & Fair Deal'g | SC U.T.P.A. | SC U.T.P.A. |
| Count VII | Negl. Design * & Mnfctr | 18 USC 1962(c) * | Promis'y Estop. |
| Count VIII | SC U.P.T.A. | 18 USC 1962(b) * | 18 USC 1962(c) * |
| Count IX | Promis'y Estop | 18 USC 1962(a) * | 18 USC 1962(b) * |
| Count X | 18 USC 1962(c) * | ———— | 18 USC 1962(a) * |
| Count XI | 18 USC 1962(b) * | ———— | ———— |
| Count XII | 18 USC 1962(a) * | ———— | ———— |

* Asterisk denotes the claims that are the subject of the Westinghouse Motion to Dismiss.