**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 20-1636**

---

BARBARA L. ROBINSON,

        Plaintiff – Appellant,

    v.

JOHN MARK WILLIAMS, M.D., in his individual capacity,

        Defendant – Appellee,

    and

EAST CAROLINA UNIVERSITY; MARK D. IANNETTONI, M.D., in his individual capacity; JODY COOK, MS, RN, CPHRM, in her individual capacity; MAGMUTUAL INSURANCE COMPANY, d/b/a MAGMutual Insurance Agency, LLC,

        Defendants.

---

Appeal from the United States District Court for the Eastern District of North Carolina, at Greenville.  Louise W. Flanagan, District Judge.  (4:17-cv-00112-FL)

---

Argued:  December 9, 2021                     Decided:  February 1, 2023

---

Before RICHARDSON and RUSHING, Circuit Judges, and TRAXLER, Senior Circuit Judge.

---

Vacated and remanded by published opinion.  Judge Rushing wrote the opinion, in which Judge Richardson and Senior Judge Traxler joined.  Senior Judge Traxler wrote a separate concurring opinion.

———————————

**ARGUED:** John West Gresham, TIN, FULTON, WALKER & OWEN, PLLC, Charlotte, North Carolina, for Appellant.  Laura Howard McHenry, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellee.  **ON BRIEF:** Cheyenne N. Chambers, TIN, FULTON, WALKER & OWEN, PLLC, Charlotte, North Carolina, for Appellant.  Joshua H. Stein, Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellee.

———————————

RUSHING, Circuit Judge:

A cardiothoracic surgeon, Dr. Barbara L. Robinson, sued another cardiothoracic surgeon, Dr. John Mark Williams, alleging that his remarks about her performance during an aborted surgery defamed her. On summary judgment, the district court determined that Williams's statements—that Robinson "misread" or "failed to recognize" the findings on the patient's echocardiogram before beginning surgery—were not false, as Robinson admitted she did not read the echocardiogram at all before operating. The district court therefore concluded the statements could not be actionable under North Carolina law.

We disagree with the district court's appraisal on summary judgment. To say that Robinson "misread" the echocardiogram presupposes that she read it in the first place, which she did not. And the defamatory sting of Williams's statements—that Robinson either lacked skill in applying her medical judgment to interpret the echocardiogram or deviated from the standard of care by failing to evaluate the echocardiogram results before operating—presents a conclusion about which the parties, and the evidence, sharply disagree. For these reasons, the district court erred in finding no dispute of material fact as to the falsity of Williams's statements. We accordingly vacate the summary judgment order and remand for further proceedings.

## I.

Because this appeal follows the award of summary judgment, "we recount the facts below in the light most favorable to [Robinson], the non-moving party." *SD3 II LLC v. Black & Decker (U.S.) Inc.*, 888 F.3d 98, 103 (4th Cir. 2018).

A.

Patient M was scheduled for elective aortic valve replacement surgery on April 14, 2015. Seven months earlier, Dr. Brian Cabarrus diagnosed Patient M with severe aortic insufficiency (AI) based on the results of a transesophageal echocardiogram (TEE), a procedure that produces images of a patient's heart. Cabarrus determined that Patient M required surgical evaluation and referred her to East Carolina Heart Institute, a clinical practice associated with the School of Medicine at East Carolina University and the Vidant Medical Center in Greenville, North Carolina. Williams, a surgeon at the Institute, accepted Patient M as a new patient without verifying Cabarrus's diagnosis. Eventually, Williams scheduled Patient M for elective aortic valve replacement surgery to remediate her purportedly severe AI.

The night before Patient M's operation, Robinson sought to review Patient M's medical records. Robinson, a clinical fellow at the Institute, was the assistant surgeon for Patient M's upcoming procedure, which meant she would actually perform the surgery. Williams was Robinson's direct supervisor and the attending surgeon with "ultimate responsibility for the entire preop[erative] and intraoperative course" of Patient M's operation. J.A. 1194. When Robinson could not find the preoperative TEE results in Patient M's file on the eve of surgery, she contacted Williams. Rather than produce the TEE images, Williams assured Robinson that he had looked at them himself, telling her, "[i]t's severe AI, don't worry about it." J.A. 132.

On the morning of the surgery, Robinson and Williams discussed Patient M's case again. No new issues were raised, and Williams directed Robinson to "[g]o ahead and

4

start" while he remained outside the operating room. J.A. 196. When Robinson arrived at the operating room, Patient M was placed under general anesthesia, and an intraoperative TEE was taken by the attending cardiac anesthesiologist, Dr. Robert Duncan. Unlike preoperative TEEs, which are diagnostic tools, intraoperative TEEs are customarily used to monitor a patient's heart during surgery and to identify contraindications that surgery should continue. Taking and reading intraoperative TEEs are typically the responsibility of the attending anesthesiologist—in this case, Duncan. Robinson did not participate in taking or monitoring Patient M's intraoperative TEE. After roughly 30 minutes in the operating room, Duncan left to attend to another patient; before exiting the room, he did not inform Robinson that the TEE showed moderate, rather than severe, AI. If "somebody had told" Robinson that Patient M did not, in fact, have severe AI based on the intraoperative TEE, she would have immediately stopped and sent for Williams. J.A. 112.

Instead, Robinson began the operation, proceeding with a sternotomy—an incision made through the breastbone to open the sternum and allow access to the heart. As Robinson understood it, this approach was "consistent with [Williams's] usual and customary practice, which was not to wait for the intraoperative [TEE results] before commencing the surgery." J.A. 1650. Minutes after the sternotomy, however, Duncan informed Robinson that the TEE images showed that Patient M's AI was moderate, not severe. Robinson halted the surgery and called Williams, who determined from the intraoperative TEE that Patient M did not require operation. Williams then cancelled the elective surgery.

5

After Patient M returned to the intensive care unit, Robinson spoke with Williams about the apparently dramatic change in Patient M's AI between the preoperative and intraoperative TEEs. During their conversation, Williams admitted to Robinson that he never actually reviewed Cabarrus's preoperative TEE images at any time before Patient M's surgery. Williams told Robinson that what happened with Patient M was "not [her] fault." J.A. 150. That was the last Robinson heard of the incident until nearly two years later, after she had left East Carolina Heart Institute.

B.

Williams reported the incident to various third parties. He first spoke to Patient M and her family. Responding to their questions about "how this could have happened," Williams accepted responsibility as the attending surgeon but told them that Robinson and Duncan had "failed to recognize the findings on the intraoperative TEE" before the sternotomy was made. J.A. 569. Shortly after the incident, Williams told the risk management teams at ECU Medicine and Vidant Medical Center that Robinson had "misread" the TEE, absent which error, the sternotomy would not have occurred. J.A. 1346–1347, 1349. In conversations with Jody Cook, the Director of Risk Management for ECU Medicine, Williams attributed the "unnecessary" surgery to Robinson's and Duncan's "misread . . . regarding the severity of the aortic insufficiency of the patient." J.A. 1349.

In November 2016, Patient M's attorney sent a demand letter to Cook, asserting several claims of negligence. Cook notified Robinson, who had left East Carolina Heart Institute in October 2016. Robinson told Cook that, in her experience, "95%" of

6

sternotomies "are done before the TEE is finalized and read." J.A. 1560. Even then, Robinson continued, a surgeon will delay the procedure only if there is some indication that the intraoperative TEE will yield a different result from the preoperative TEE. Since Robinson had no reason to suspect that the intraoperative TEE would show something other than severe AI, Robinson denied any error in Patient M's case.

After evaluating Williams's and Robinson's competing accounts and having the case reviewed by an outside expert, Cook "recommend[ed] that any settlement amount be made on behalf of Dr. Robinson and not Dr. Williams." J.A. 1565. Accepting this recommendation, ECU Medicine and its healthcare liability insurer settled Patient M's case for $74,999, identifying Robinson as the sole party at fault. The insurer submitted a medical malpractice payment report to the National Practitioner's Data Bank (NPDB), a database that collects adverse action reports filed against medical professionals. The report to NPDB was accompanied by a supplemental statement prepared for the North Carolina Medical Board, which faulted Robinson for performing the sternotomy "before Dr. Williams arrived and without reviewing the [TEE] results." J.A. 1598. As initially filed, both reports allocated 100% of the responsibility for Patient M's aborted surgery to Robinson.[1] The reports were submitted simultaneously to each state board where Robinson

---

[1] After Robinson filed her initial complaint in this action, the insurer submitted a revised report allocating 10% of the responsibility to Williams and 90% to Robinson. In several letters to the state medical board in 2018, Williams continued to press his version of the facts surrounding Patient M's surgery, repeating his statements that Robinson "should have recognized" and yet "failed to recognize the findings on the intraoperative TEE" before beginning surgery. J.A. 1639.

7

was licensed to practice: New York, Massachusetts, and California, in addition to North Carolina.

Robinson alleges that, because of these reports, she was terminated from her then-temporary employment, was denied the opportunity to apply for a permanent position with the same employer, and has since been rejected by almost a dozen potential employers. As a result, Robinson's annual income fell to roughly 65% of what it previously had been.

### C.

Robinson filed suit in the Eastern District of North Carolina shortly after the initial reports of the incident were filed with NPBD and the state boards. Although her operative complaint alleged seven causes of action against five defendants, only her defamation claim against Williams survived the defendants' motions to dismiss.

In May 2020, the district court granted Williams summary judgment on the defamation claim, finding that Robinson could not establish the required element of falsity. Regarding Williams's statement that Robinson had "misread" the intraoperative TEE, the district court noted that Robinson had no experience interpreting intraoperative TEEs but had relied on Duncan, who claimed to have known "at the outset" that the TEE showed "moderate AI," yet Robinson "insist[ed] that she was not made aware" of the moderate AI diagnosis prior to operating. J.A. 1693. The district court concluded that "the only reasonable inference to be drawn from these facts is that [Robinson] proceeded to surgery based on an incomplete understanding of Duncan's interpretation of the intraoperative TEE," therefore Williams's statement that Robinson "misread" the TEE "was not false" and could not support a defamation claim. J.A. 1693.

8

Robinson timely appealed, and we have jurisdiction under 28 U.S.C. § 1291.

## II.

We review de novo whether a defendant is entitled to summary judgment, *Brooks v. Johnson*, 924 F.3d 104, 111 (4th Cir. 2019), bearing in mind that "a judge's function" at this stage "is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial," *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (per curiam) (internal quotation marks omitted).  To prove defamation under North Carolina law, which applies here, Robinson must show that Williams made "[1] false, [2] defamatory statements [3] of or concerning [Robinson], [4] which were published to a third person." *Boyce & Isley, PLLC v. Cooper*, 568 S.E.2d 893, 897 (N.C. Ct. App. 2002); *see Desmond v. News & Observer Publ'g Co.*, 846 S.E.2d 647, 661 (N.C. 2020).  Only the first element is at issue on appeal, so we ask simply whether there is a genuine dispute of fact about the falsity of Williams's statements.

"[T]he issue of falsity . . . focuses on *substantial truth*." *Desmond*, 846 S.E.2d at 675 (internal quotation marks omitted); *see Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 516 (1991).  "Thus, a plaintiff must establish that 'the sting,' the aspect causing injury to the plaintiff's reputation, is materially false." *Desmond*, 846 S.E.2d at 675.  In making this assessment, we consider the allegedly defamatory statement and the facts implied by that statement "within their full context." *Boyce & Isley*, 568 S.E.2d at 899; *see Desmond*, 846 S.E.2d at 675.

After reviewing the evidence and the parties' arguments, we find a genuine dispute exists regarding the substantial truth of Williams's assertion that Robinson "misread"

9

Patient M's TEE or "failed to recognize" from the TEE that the AI was moderate. Robinson offers two alternative interpretations of these statements that a jury, believing her evidence, could reasonably draw and conclude were false.

First, the accusation that Robinson misread or misapprehended the TEE results implies that she read those results in the first place, which she did not. Williams responds that the difference between "misread" and "did not read" is immaterial. In his view, the injurious sting of either statement is that Robinson performed a sternotomy on Patient M without knowing whether the intraoperative TEE showed severe or moderate AI, which is true. But a jury could interpret the gist of that statement differently, and we think it is premature to decide otherwise. Saying that a person has misread something communicates not only that she read it, but that she did so incorrectly—implying, in this case, that she lacks skill in applying her medical judgment. A jury might reasonably conclude that this accusation constitutes a distinct critique of Robinson's professional competence. A statement like "Robinson did not read the TEE," by contrast, says nothing about her ability to do so or about her judgment to proceed with a sternotomy despite supposedly having viewed the concerning TEE results.[2] In other words, Williams's assertion that Robinson misread the TEE—a statement that all concede is literally false—may be viewed as

---

[2] On this point, we note that the district court did not recount the disputed facts in the light most favorable to Robinson when the court stated that Duncan knew "at the outset" that "moderate AI was the result of the intraoperative TEE" and yet Robinson proceeded to surgery with "an incomplete understanding of Duncan's interpretation." J.A. 1693. Although Duncan testified to that effect, Williams testified that Duncan initially observed the AI "was severe" and then "changed his opinion" after the surgery had begun. J.A. 354–355.

10

"materially false" as well. *Desmond*, 846 S.E.2d at 675. Use of the term "misread," in this context, could "cause the [statement] to produce a different effect on the audience than would have been produced had the truth of the matter been spoken." *Aids Counseling & Testing Ctrs. v. Grp. W Television, Inc.*, 903 F.2d 1000, 1004 (4th Cir. 1990). Whether it did so is for a jury to decide.

Second, Williams's statements that Robinson "misread" and "failed to recognize" the findings of the intraoperative TEE before the sternotomy could be understood to imply that Robinson had an obligation to read and understand the TEE before beginning the surgery, which she failed to fulfill. Whether such an obligation exists is hotly disputed in this case. Robinson has produced evidence suggesting that the medical standard in Patient M's case did not require Robinson to await intraoperative TEE results before beginning the sternotomy; Williams has produced evidence reaching the opposite conclusion. At this juncture, it suffices to observe that if a jury believed Robinson's evidence, it could conclude that the sting of Williams's implication—that Robinson had a professional obligation she admittedly did not fulfill—is materially false. *See Desmond*, 846 S.E.2d at 675 ("[T]he issue of falsity relates to the *defamatory* facts implied by a statement." (internal quotation marks omitted)).

We pause to note our agreement with the district court's emphasis that "the instant claim is not one for medical negligence." J.A. 1694. Robinson's claim "turns on whether [Williams's] statements about [her] are false," not Williams's own "shortcoming regarding [P]atient M's care and any statements or omissions connected to such shortcomings." J.A. 1694. As such, this case is not the forum for assigning fault for Patient M's outcome. At

11

the same time, the truth or falsity of Williams's statements about Robinson overlaps to some degree with the terminology of medical negligence, at least on this second theory. The defamatory sting of Williams's statements under this theory is not that Robinson failed to recognize moderate AI on the intraoperative TEE but that she had a professional obligation to do so before beginning the surgery, implying that her failure to read and understand the TEE before making the first incision was malpractice. And a false accusation of malpractice may certainly be defamatory.

## III.

We conclude that Williams's allegedly defamatory statements—that Robinson "misread" or "failed to recognize" the findings of Patient M's intraoperative TEE—are capable of more than one reasonable interpretation as to which there exists a genuine dispute regarding material falsity. We therefore vacate the district court's ruling on summary judgment and remand for further proceedings consistent with this opinion.

*VACATED AND REMANDED*

12

TRAXLER, Senior Circuit Judge, concurring:

I agree that the record before us shows the existence of material questions of fact, and I therefore concur in the opinion reversing the district court's grant of summary judgment in favor of Dr. John Mark Williams on the defamation claim asserted against him by Dr. Barbara Robinson.

Robinson and Williams are both board-certified cardiothoracic surgeons with extensive experience. At the time of the events giving rise to this case, Robinson was a clinical fellow at the East Carolina Heart Institute, and Williams was her supervisor. This case centers on an aortic valve replacement surgery for "Patient M." Valve-replacement surgery is warranted only for patients who have *severe* aortic valve insufficiency; patients with only *moderate* valve insufficiency are treated medically rather than surgically. The existence and degree of valve insufficiency is determined with a transesophageal echocardiogram (TEE), which sends a probe down the esophagus to capture images of the heart. Patient M was accepted for surgery by Williams based on a report from her doctor that she was suffering from severe aortic insufficiency. Robinson had begun the valve-replacement surgery and had cut through Patient M's sternum when it was determined through an intraoperative TEE that Patient M had only moderate aortic insufficiency, at which point Robinson halted the surgery,

Robinson contends that Williams defamed her when he told the family of Patient M and others that Robinson misread the intraoperative TEE and performed an unnecessary surgery by failing to recognize that Patient M was suffering from moderate, not severe, valve insufficiency.

13

The district court granted summary judgment in favor of Williams after concluding that Williams' statements were substantially true. *See Desmond v. News & Observer Publ'g Co.*, 846 S.E.2d 647, 675 (N.C. 2020) ("With respect to the issue of falsity, the common law of libel overlooks minor inaccuracies and focuses on *substantial truth.* As such, minor inaccuracies do not amount to falsity so long as the substance, the gist, *the sting*, of the libelous charge be justified.") (cleaned up). According to the district court, because "the only reasonable inference to be drawn from [the record] is that plaintiff proceeded to surgery based on an incomplete understanding of [the anesthesiologist's] interpretation of the intraoperative TEE, defendant's statement that plaintiff 'misread' the intraoperative TEE was not false." J.A. 1693.

The district court's analysis was based on an implicit assumption that Robinson had some kind of duty regarding the results of the intraoperative TEE—either a duty to review and interpret the TEE herself before proceeding with the surgery, or a duty to inquire about the anesthesiologist's interpretation of the TEE before proceeding. Although Williams presented evidence indicating that Robinson in fact was obliged to determine the results for herself or inquire about them, Robinson' evidence indicated that she had no such duty. According to Robinson's expert witness, it is within the standard of care for a cardiothoracic surgeon to "simultaneously proceed[] with the chest incision while the TEE is being performed." J.A. 458. The expert explained that Robinson "was not in a position, either by training or status, to make a direct determination of the severity of the aortic insufficiency as displayed on the intraoperative TEE," and that, instead, "the onus" was on

14

the anesthesiologist to tell Robinson and Williams if the TEE results were unexpected. J.A. 459.

In my view, this dispute about the existence and scope of Robinson's duty regarding the intraoperative TEE precludes summary judgment. Williams' attribution of the unnecessary surgery to Robinson's misreading of the TEE and her failure to recognize the findings of the TEE must be understood as accusing Robinson of breaching her duties as a cardiothoracic surgeon. If Robinson did not read the TEE and had no duty to do so, then Williams' statements are false and therefore support her claim of defamation. *See Cohen v. McLawhorn*, 704 S.E.2d 519, 527 (N.C. Ct. App. 2010) ("North Carolina has long recognized the harm that can result from false statements that impeach a person in that person's trade or profession—such statements are deemed defamation *per se*.") (cleaned up). Likewise, if Robinson did not have a duty to inquire about the results of the TEE, her failure to do so before proceeding with the surgery was not improper and was not the cause of the unnecessary surgery.

Accordingly, because there are genuine issues of material fact about whether Robinson had a professional duty to interpret the intraoperative TEE or to inquire about the results before commencing the surgery, the district court erred by granting summary judgment in favor of Dr. Williams.

15