UNITED STATES of America, Appellee,

v.

Robert GRIFFIN, Appellant.

UNITED STATES of America, Appellee,

v.

Benjamin GARONZIK, Appellant.

UNITED STATES of America, Appellee,

v.

Stanley DIAMOND, Appellant.

Nos. 80–5124, 80–5129 and 80–5134.

United States Court of Appeals,
Fourth Circuit.

Argued June 5, 1981.

Decided Oct. 2, 1981.

Certiorari Denied Jan. 11, 1982.
See 102 S.Ct. 1029.

Joseph F. Murphy, Jr., Towson, Md., for appellant Robert Griffin.

Benjamin Lipsitz, Baltimore, Md., for appellant Benjamin Garonzik.

L. Paige Marvel, Baltimore, Md., for appellant Stanley Diamond.

David Dart Queen, Asst. U. S. Atty., Baltimore, Md. (Russell T. Baker, Jr., U. S. Atty., Price O. Gielen, Asst. U. S. Atty., Baltimore, Md., on brief), for appellee.

Before PHILLIPS and MURNAGHAN, Circuit Judges, and RICHARD L. WILLIAMS, District Judge, sitting by designation.

JAMES DICKSON PHILLIPS, Circuit Judge:

Defendants in these consolidated appeals challenge their jury convictions for conspiracy to violate and the substantive violation of various sections of Title IX of the Organized Crime Control Act of 1970, 18 U.S.C. §§ 1961–1968 (RICO). We find no reversible error and affirm the convictions.

I

The indictment against Griffin, Garonzik, Diamond and two other persons, Baumgarten and Clott,[1] resulted from a coordinated federal/state investigation in which ten persons were ultimately charged in two federal indictments[2] and seven others were prosecuted by the State of Maryland. All seventeen eventually either were convicted following trial or pled guilty.

Count I of the indictment charged the defendants with conspiracy to violate 18 U.S.C. § 1962(c) in violation of 18 U.S.C. § 1962(d). In Count II, the defendants were charged with knowing participation in the conduct of the affairs of an "enterprise" through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c). The "enterprise" was defined as a "group of individuals [identified as including all the defendants and other unindicted co-conspirators in the conspiracy count] associated in fact to protect, promote and facilitate the interests of illegal gambling operations by corruption, bribery and attempted bribery of members of the police force of Baltimore City." The pattern of racketeering activity was alleged to consist of a series of payments to police officers over a period extending from September 6, 1978, to December 4, 1980.

At trial, the government presented evidence that Baltimore City Police vice squad officers George Klein and Broderick Kincaid were approached by a fellow officer in the fall of 1978 and told that retired police officer James Hooper wished to see them. Klein and Kincaid subsequently met with Hooper at a bar owned by him in northern Baltimore. Hooper told the officers that Sidney Allen, a bookmaker who had recently been raided by the vice squad, was willing to give them a paid vacation and money in return for the name of the informant who had provided the police with information about his bookmaking operation.

Klein and Kincaid immediately reported the attempted bribe to a superior officer. They were instructed to attend subsequent meetings with recorders which, it was arranged, would be monitored by the F.B.I. Klein and Kincaid subsequently met with Allen, who agreed to pay them $150 a month. He also revealed that he worked for a gambling operation controlled by Joseph Minoglio and Roy Calhoun.

At a meeting approximately one month later, Allen surprised the officers with a payment of $300. No explanation was given for the increased payment, but Allen told the officers that Garonzik, who had recently been arrested on various gambling charges, wished to meet with them.

Garonzik subsequently met with Klein and Kincaid and told them he would pay them $150 a month for the same favorable treatment and protection they had agreed to provide Allen. Garonzik informed the policemen that he worked for a gambling operation run by Stanley Diamond.

In April 1979, Klein and Kincaid arrested Diamond, whom they had never met, and Baumgarten on bookmaking charges. A few days after his arrest, Diamond met with the officers, informed them that he knew about the payments his employee, Garonzik, had been making to them for protection, and stated that he thought the bribes were "beautiful."

---

1. Baumgarten and Clott pled guilty to and were sentenced under the conspiracy count of the indictment and are not parties to this appeal.

2. The conviction of Sidney Allen, a defendant charged in the other federal indictment, was recently affirmed by this court. *United States v. Allen*, 656 F.2d 964 (4th Cir., 1981).

During this meeting, Diamond also told the officers that Baumgarten worked for a gambling operation run by two men named Jackman and Winterling and that that operation would pay them $1,000 to get the charges against Baumgarten dismissed. In response to a question from Kincaid, Diamond stated that he thought Baumgarten's organization would pay $200 a month for protection.

At a meeting in May, Diamond offered to pay Klein and Kincaid $1,000 to secure dismissal of the charges against him and the return of the $8,000 that had been seized at his arrest in April. Approximately two weeks later Diamond took the officers to a meeting with Baumgarten, who paid them $1,000. Diamond subsequently paid the officers the $1,000 he had offered for aid.

Shortly after his relationship with Klein and Kincaid began, Garonzik informed the officers that he knew another man who wished to make payments in return for protection from the officers. The officers subsequently met with Garonzik, who was accompanied by Clott, to set up a meeting between the officers and Griffin, the man who Garonzik had told the officers sought their protection. Garonzik told the officers that a gambling operation run by Clott and others had a "half book" arrangement with a gambling operation run by Griffin and Jerry Prevetti whereby the two bookmaking operations divided the risk of loss and the distribution of profits.

Klein and Kincaid subsequently met with Griffin, who agreed to pay them $200 a month for favorable treatment. In addition, he offered to pay the officers $500 if they would destroy lottery slips that had been seized by the police in a raid on Griffin's operation. Griffin also revealed that he often obtained "line" information from Diamond's operation.

Griffin later arranged a meeting between Klein and Kincaid and Clott, who offered the officers $1,000 to find out the name of the informant who had been providing police with information on his gambling operation in Silver Spring, Maryland. When asked if he could be trusted, Clott responded that he was the one who had led Griffin to the officers.

## II

The defendants contend on appeal that their convictions should be reversed because RICO is directed only at legitimate enterprises; an "enterprise" defined under section 1962(c) must have an economic goal separate from the alleged pattern of racketeering; there was insufficient evidence that the enterprise defined in the indictment of the defendants had an effect on interstate commerce; and because there was insufficient evidence to support jury findings that the conspiracy alleged in Count I and the enterprise alleged in Count II existed. They further contend that the court erred in refusing certain instructions and otherwise in the handling of jury inquiries.

■ Since these appeals were heard, the Supreme Court, in *United States v. Turkette*, —— U.S. ——, 101 S.Ct. 2524, 69 L.Ed.2d 246 (U.S.1981), has now directly disposed of the first and, by necessary implication, of the second of these contentions against the position of the defendants. For the reasons given by another panel of this court in the companion case against Sidney Allen we hold that the evidence here was sufficient to support a finding that the enterprise alleged had a sufficient effect on interstate commerce to fall within the ambit of RICO.[3] *See United States v. Allen*, 656 F.2d 964 (4th Cir., 1981). We have examined and found no prejudicial error in the district court's instructions to the jury and in its refusal to give certain requested instructions.

Because it presents more serious problems, we discuss briefly, though in the end we reject also, the defendants' contention that the evidence showed that no defendant paid money to protect any gambling operation except the one in which he was involved, so that neither the meeting of minds requisite to proof of conspiracy nor

3. Here as in the *Allen* case there was adequate evidence that the gambling operations whose protection was the purpose of the "enterprise" affected interstate commerce.

the common purpose requisite to proof of an associated-in-fact "enterprise" was sufficiently shown.

### III

■ The substantive "enterprise" violation of RICO charged to these defendants includes these essential elements: (1) employment by or association of a defendant with (2) an "enterprise" (3) engaged in or affecting interstate commerce (4) the affairs of which are conducted by or participated in by the defendant "through a pattern of racketeering activity." 18 U.S.C. § 1962(c). It is now settled—after some division within the courts—that the enterprise contemplated may be an illegitimate as well as a legitimate one. *Turkette; accord United States v. Whitehead*, 618 F.2d 523, 525 n.1 (4th Cir. 1980). Where, as here, the enterprise charged is a wholly criminal one, proof of its existence may overlap proof of the connecting pattern of racketeering activity, but "proof of one does not necessarily establish the other." *United States v. Turkette*, —— U.S. at ——, 101 S.Ct. at 2528. In that situation, "[t]he 'enterprise' is not the 'pattern of racketeering activity'; it is an entity separate and apart from the pattern of activity in which it engages," and its separate existence must be proved in order to convict. *Id.*

■ Although RICO contemplates that an "individual" may be an "enterprise," 18 U.S.C. § 1961(4), its basic concern, and the one here pertinent, is with associational enterprises. Of these, it posits two kinds. The first, not directly pertinent here, includes "legal entities," such as corporations and partnerships; the second, which is pertinent, includes "group[s] of individuals associated in fact though not a legal entity." *Id.; see United States v. Turkette*, —— U.S. at ——, 101 S.Ct. at 2528.

We need not be concerned here, except for purposes of contrast, with the way in which the existence of a "legal entity" RICO enterprise may be proved. Presumably—if contested at all—it would involve proof simply of the "legal" existence of the corporation, partnership, or other legal form of organization charged. Neither the actual nor ostensible purpose of such an enterprise would seem directly relevant to proof of a RICO violation, just so long as it was shown that a defendant was associated with or employed by the legal entity and that the actual "affairs" of the enterprise were being conducted by the requisite pattern of racketeering activity.

■ But where, as here, the RICO enterprise charged is not a legal entity, but merely a "group of individuals associated in fact," the purpose of the association, along with the composition of the group, would seem essential to proof of such an entity's "separate" existence. Indeed it is only in these two dimensions that such an entity would seem to have any discrete existence. The *Turkette* Court recognized as much in analyzing the nature of an "illegitimate" RICO enterprise. Such an entity, the Court said, is "a group of persons associated together for a *common purpose* of engaging in a course of conduct." *Id.* at ——, 101 S.Ct. at 2528 (emphasis added). Further, explained the Court, its existence "is proved by evidence of an *ongoing organization, formal or informal,* and by evidence that the various associates function as a *continuing unit*." *Id.* (emphasis added).

The illegitimate, associated-in-fact RICO enterprise thus shares important characteristics with the traditional conspiracy of criminal law. Indeed, one of the avowed purposes of RICO was to relieve some of the deficiencies of the traditional conspiracy prosecution as a means for coping with contemporary organized crime. The increasing complexity of "organized" criminal activity had made it difficult to show the single agreement or common objective essential to proof of conspiracy on the basis of evidence of the commission of highly diverse crimes by apparently unrelated individuals. Congress attempted through RICO to relieve this problem by creating a new substantive offense, association in fact in an enterprise whose affairs are conducted through a pattern of racketeering activity, 18 U.S.C. § 1962(c), in which "association" is presumably easier to prove than conspiracy, while at the same time creating a RICO conspiracy offense, 18 U.S.C.

§ 1962(d) whose common objective is simply the commission of the substantive associational offense. *United States v. Elliott,* 571 F.2d 880, 902 (5th Cir. 1978).

While within the resulting statutory scheme conspiracy remains conspiracy and an associated-in-fact enterprise is plainly intended to be something different and less difficult of proof, they nevertheless continue to share the basic characteristic that each proscribes purposeful associations of individuals. It is this shared characteristic that has created the special danger that in conspiracy prosecutions guilt will not be assessed on an "individual and personal," basis, *Kotteakas v. United States,* 328 U.S. 750, 772, 66 S.Ct. 1239, 1251, 90 L.Ed. 1557 (1946), but solely by association. Judge Learned Hand's admonition in the conspiracy context, *see United States v. Falcone,* 109 F.2d 579, 581 (2d Cir. 1940), is therefore applicable as well to charge and proof of this kind of RICO enterprise: if the government must show that a defendant has participated in or conducted the affairs of an enterprise in order to hold him for associating with others in it, then it is essential to determine the purpose of the enterprise. The relevant analysis in *Turkette* is precisely to this effect. Proof of the existence of an associated-in-fact enterprise requires proof of a "common purpose" animating its associates, and this may be done by evidence of an "ongoing organization, formal or informal," of those associates in which they function as a "continuing unit." —— U.S. at ——, 101 S.Ct. at 2528. The ties between the individual associates that are implied by these concepts of continuity, unity, shared purpose and identifiable structure operate precisely to guard against the danger that guilt will be adjudged solely by virtue of associations not so related. They define the line between "concerted action" through "group association for criminal purposes," for which "combination in crime" may constitutionally be proscribed, *Callanan v. United States,* 364 U.S. 587, 593–94, 81 S.Ct. 321, 325, 5 L.Ed.2d 312 (1961) and less clearly related conduct that may not be so proscribed and prosecuted.

Critical therefore to charge and proof of the existence of an associated-in-fact enterprise under § 1962(c) is charge and proof of a common purpose for which the group of individuals alleged to constitute the enterprise have associated themselves. That proof may of course be direct but, as the *Turkette* Court pointed out, it may also be circumstantial, as by evidence that the group of individuals functions as a continuing unit in an informal or formal organization engaged in a course of conduct directed toward the accomplishment of the common purpose alleged. —— U.S. at ——, 101 S.Ct. at 2528. Here, though we concede the question to be a close one, we think the circumstantial evidence of the existence of the enterprise charged was sufficient to support the jury's finding on this issue.

Defendants contend that there was no direct or circumstantial evidence that in paying the various bribes attributed to them Griffin, Diamond and Garonzik were motivated by the common purpose alleged in the indictment—"to protect, promote, and facilitate the interests of illegal gambling operations." Rather, they say, the evidence tends only to show, and unmistakably to show, that they had no such common purpose but instead acted, "each man for himself and the devil take the hindmost," only to protect the interests of his own operation. This being so, since the existence of a common purpose is essential to the existence of an associated-in-fact enterprise, there has been a total failure of proof in respect of this essential element of the substantive offense as it was charged.

We disagree. The inference suggested by defendants as the only permissible one was undoubtedly a possible one, but it was not the only permissible one. We think that the evidence sufficiently supports the alternative inference which the jury drew, that whatever private purposes there may have been there was also the requisite commonality of purpose between the defendants to give form to the associational enterprise charged. The jury could properly have found that beyond a reasonable doubt the defendants had a common purpose, which they carried out as an "informal" but "continuing unit" of associates within the meaning of RICO, *see United States v. Turkette,*

—— U.S. at ——, 101 S.Ct. at 2528, to further their shared interest in having the police department that was primarily responsible for ferreting out their individual criminal acts rendered impotent by corruption and bribery as to all such criminal activity in their bailiwick. There was adequate evidence of concerted activity by the defendants in deliberately broadening the scope, hence the total weight, of the corrupting influence to justify a finding of such a common purpose, hence of an identifiable "enterprise" centered upon and given form by that purpose.

## IV

■ On much the same analysis of the record, we are also satisfied that the evidence of conspiracy to violate the substantive offense sufficed to support the conviction under § 1962(d). Again, though the evidence may well have suggested a variety of individual motivations on the defendants' part for their bribery activities, it also sufficed to support the required finding that they had a "common objective" of associating themselves in an ongoing, informally organized enterprise to bribe and corrupt. This would supply that element of the conspiracy count. *See United States v. Elliott*, 571 F.2d at 902.

Specifically, the evidence sufficed to show that such a conspiracy involving Garonzik and Diamond originated when Garonzik first met with the police officers to initiate bribery conversations designed directly to benefit the operation with which he was connected and that was headed by Diamond, and that Griffin joined the conspiracy no later than the date shortly thereafter when Garonzik again met with the officers and informed them that Griffin wanted to start an "account."

*AFFIRMED.*