**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 23-1991

AMAZON.COM, INC.; AMAZON DATA SERVICES, INC.,

Plaintiffs – Appellants,

v.

WDC HOLDINGS LLC, d/b/a Northstar Commercial Partners; BRIAN WATSON; STERLING NCP FF, LLC; MANASSAS NCP FF, LLC; NSIPI ADMINISTRATIVE MANAGER; CARLETON NELSON; CASEY KIRSCHNER; CHESHIRE VENTURES LLC; RODNEY ATHERTON,

Defendants – Appellees,

and

RENRETS LLC; NOVA WPC LLC; WHITE PEAKS CAPITAL LLC; VILLANOVA TRUST; ALLCORE DEVELOPMENT LLC; FINBRIT HOLDINGS LLC; 2010 IRREVOCABLE TRUST; SIGMA REGENERATIVE SOLUTIONS LLC; CTBSRM, INC.; DEMETRIUS VON LACEY,

Defendants.

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria.  Rossie David Alston, Jr., District Judge.  (1:20-cv-00484-RDA-IDD)

Argued:  October 30, 2024                    Decided:  September 16, 2025

Before AGEE and RUSHING, Circuit Judges, and FLOYD, Senior Circuit Judge.

Reversed and remanded by published opinion. Judge Rushing wrote the opinion, in which Judge Agee and Senior Judge Floyd joined.

———————————————

**ARGUED:** Thomas G. Hungar, GIBSON, DUNN & CRUTCHER LLP, Washington, D.C., for Appellants. Kian James Hudson, BARNES & THORNBURG LLP, Indianapolis, Indiana; Julie Smith Palmer, HARMAN, CLAYTOR, CORRIGAN, & WELLMAN, Richmond, Virginia, for Appellees. **ON BRIEF:** David Debold, Patrick F. Stokes, Claudia M. Barrett, David W. Casazza, Amanda Sterling, John H. Heyburn, GIBSON, DUNN & CRUTCHER LLP, Washington, D.C., for Appellants. Stanley L. Garnett, Sara R. Bodner, GARNETT POWELL MAXIMON BARLOW, Boulder, Colorado; George R. Calhoun, IFRAH PLLC, Washington, D.C., for Appellees Brian Watson; WDC Holdings LLC; Sterling NCP FF, LLC; Manassas NCP FF, LLC; and NSIPI Administrative Manager. Alex Little, Nashville, Tennessee, Adam Smart, BURR & FORMAN, LLP, Jacksonville, Florida, for Appellees Carleton Nelson and Cheshire Ventures LLC. Alison W. Feehan, HARMAN, CLAYTOR, CORRIGAN, & WELLMAN, Richmond, Virginia, for Appellee Rodney Atherton. J.D. Thomas, BARNES & THORNBURG LLP, Nashville, Tennessee, for Appellee Casey Kirschner.

———————————————

RUSHING, Circuit Judge:

Amazon.com, Inc. and Amazon Data Services, Inc. (together, Amazon) sued two former employees, a real estate developer, and related individuals and entities, alleging an extensive kickback scheme connected to real property transactions in Northern Virginia. The district court granted summary judgment for the defendants on Amazon's claim under the Racketeer Influenced and Corrupt Organizations (RICO) Act; its claims of fraud, unjust enrichment, and conversion; and part of its civil conspiracy claim. We conclude that genuine disputes of material fact preclude summary judgment on each claim. Accordingly, we reverse and remand for further proceedings.

I.

Because this appeal follows an award of summary judgment, we recount the facts in the light most favorable to Amazon, the non-moving party. *See Robinson v. Williams*, 59 F.4th 113, 115 (4th Cir. 2023).

A.

Amazon develops real property to support its business operations, including its data services. Defendants Casey Kirschner and Carleton Nelson were real estate transaction managers at Amazon who were responsible for developing Amazon data centers in Northern Virginia. Their responsibilities included identifying and selecting locations, landlords, and developers; conducting due diligence and negotiating the terms of real estate transactions; and steering the transactions through Amazon's internal approval process.

Nelson and Kirschner worked on two types of transactions. In direct-purchase transactions, Amazon purchased land outright and then developed facilities on the sites

3

itself.  In build-to-suit leasing transactions, Amazon identified a suitable location and contracted with a real estate developer, which acquired and developed the land.  The developer would build the facility's external shell, and Amazon would lease the property and complete the interior.

### B.

In 2017, Kirschner's brother, Christian Kirschner,[1] introduced him to defendant Brian Watson, the CEO of defendant WDC Holdings, LLC, which does business as Northstar Commercial Partners.  Northstar is a privately held real estate investment and asset management company.

Northstar submitted its first bid to Amazon for a build-to-suit leasing transaction in September 2017 and won the deal.  Before submitting the bid, Watson consulted with Kirschner and Nelson about pricing.  Kirschner and Nelson represented to Amazon that Northstar won in a competitive bidding process, but the parties dispute whether any other developer actually received the request for proposal.

Between February 2018 and January 2020, Amazon engaged Northstar for nine different build-to-suit leasing projects in Virginia worth hundreds of millions of dollars.  In each case, Kirschner and Nelson negotiated the terms with Northstar and presented the transaction to Amazon management for approval.  Amazon executed leases with Northstar-affiliated LLCs that acted as landlord-developers for the properties.  Watson signed each lease on behalf of the LLCs, which promised to "promptly provide" written notice

---

[1] This opinion adopts the parties' practice of referring to Casey Kirschner as "Kirschner" and Christian Kirschner as "Christian."

4

regarding "any improper solicitation, demand or other request for a bribe, improper gift or anything of value, made by any party in connection" with the lease.  J.A. 6501–6502.

## C.

Shortly after Northstar won its first bid with Amazon, but before it executed the lease, defendant Rodney Atherton, an attorney, created the Villanova Trust, naming Christian as the sole trustee.  The Villanova Trust then entered an agreement with Northstar, under which Northstar would pay purported "referral fees" to the Villanova Trust, calculated as a percentage of the fees Northstar received on its Amazon leases. Kirschner instructed Christian and Watson about the financial terms to include in this agreement.  Watson signed the agreement on behalf of Northstar, and Christian signed for the Villanova Trust.  During the course of Northstar's business transactions with Amazon, Northstar sent over $5 million in wire transfers to the Villanova Trust.

The Villanova Trust, in turn, transferred money not only to Christian but also to entities that funneled funds to Nelson and Kirschner.  Atherton, Nelson, and Kirschner worked together to establish a network of sham entities to receive and launder the payments from the Villanova Trust, including the 2010 Irrevocable Trust, AllCore Development LLC, CTBSRM, Inc., Finbrit Holdings LLC, and Cheshire Ventures LLC.  Portions of the kickbacks were transferred to these entities—and eventually to Nelson, Kirschner, and entities they controlled—as direct payments, uncollateralized supposed loans, or purported investments.  In an engagement letter to Kirschner and Nelson, Atherton acknowledged that the scheme "may meet the definition of occupational fraud," but he nevertheless created the entities and transferred funds between them.  J.A. 7681.

5

According to Amazon, the defendants inflated Amazon's costs to fund these illicit kickbacks. At Christian's instruction, Watson built into the project budgets certain fees, thereby inflating Amazon's rent for the leased properties. Those fees would then fund payments from Northstar to the Villanova Trust. As Amazon's expert explained, "the overall lease budget and Amazon's rent would have been lower, had the portion of Northstar's fees paid to Villanova Trust been eliminated." J.A. 2460.

Kirschner and Northstar also increased Amazon's costs on subsequent lease transactions by negotiating higher yields—percentages used to determine Amazon's rent— than Northstar had agreed to during the first pair of deals. For example, internal emails reveal Northstar would have "be[en] okay with" a lower yield on a particular lease transaction but negotiated a higher yield with Kirschner, just under the other proposal he had received. J.A. 2418. In Amazon's reading, these emails demonstrate that Kirschner effectively coached Northstar regarding how high of a yield it could obtain from Amazon while still appearing competitive "'on paper,'" resulting in Northstar obtaining a higher yield than it had during its initial build-to-suit leasing transactions with Amazon. J.A. 2415.

Amazon also alleges the defendants received other amounts that were owed to Amazon but that Watson and the Kirschners routed through Northstar and the Villanova Trust into their own pockets. For example, Amazon's real estate broker for the land purchases underlying the lease transactions agreed to rebate part of its commissions back to Amazon, but Kirschner directed the broker to route those rebates to Northstar instead.

6

Watson then caused Northstar to pass most of the rebated funds to the Villanova Trust for the benefit of Nelson and Kirschner.

## D.

Kirschner and Nelson also facilitated two direct-purchase transactions for Amazon that utilized the entities Atherton created and controlled: the White Peaks and Blueridge transactions.

### i.

Amazon purchased the White Peaks property in July 2019 from two LLCs controlled by Northstar employees Kyle Ramstetter and Will Camenson. Ramstetter and Camenson bought the property and sold it later the same day to Amazon at a profit of over $15.5 million. Kirschner and Nelson supported the sale internally at Amazon, although Nelson was fired (for conduct unrelated to this case) before the deal closed. Ramstetter transferred nearly $1 million of the profit to the Atherton-controlled 2010 Irrevocable Trust. The money was then routed to Nelson and Kirschner through other Atherton-created entities.

When Watson learned about the deal, he confronted Ramstetter over usurping Northstar's corporate opportunities. Watson recorded his meeting with Ramstetter, during which he demanded that Ramstetter and Camenson pay Northstar for the inflated price of the White Peaks sale. In that recording, Ramstetter alluded to the leasing-transaction scheme, saying: "[W]hat we did for Amazon, that's FBI. You have two corporate real estate people for the largest tenant in the world that you can trace the money, it will get out of hand. . . . We all know what we did." J.A. 3692. Ramstetter urged Watson to "work

7

something out" because "[i]f I say something to the wrong person, and it gets out, the whole Amazon thing is shut down and we will never do another deal in the data center space. And that's not a threat from me, that . . . has been told to me . . . by said party." J.A. 3692.

Following this conversation, Ramstetter and Camenson were suspended from Northstar and agreed to pay Watson $5 million of the profit from the White Peaks purchase transaction. The settlement required all parties to keep their dispute and its whistleblower allegations confidential, including from Amazon.

### ii.

Nelson and Kirschner arranged another direct purchase in 2019 known as the Blueridge transaction. Although they initially explored a transaction with the land's owner, Nelson and Kirschner instead introduced a third-party investor, Blueridge Group, into the transaction. Nelson structured and proposed the deal, and Kirschner supported it internally at Amazon after Nelson was terminated. Blueridge Group purchased the land and then months later transferred the purchase agreement to Amazon for a $10 million assignment fee. Blueridge Group then paid $4.8 million of that assignment fee to the 2010 Irrevocable Trust that Atherton created and controlled, which Atherton then transferred to the other entities he had created for the benefit of Nelson and Kirschner.

### E.

Eventually a whistleblower reported Kirschner's and Nelson's kickbacks to Amazon. Amazon began an internal investigation and also alerted federal law enforcement. During an FBI interview, Kirschner signed a confession admitting that he "accepted money from Northstar associated with deals [he] worked on with Amazon." J.A.

2974. Kirschner further confessed that "Northstar paid kickbacks, which were paid to the Villanova Trust," which then transferred a percentage "of the funds from Northstar to the 2010 Irrevocable Trust," from which Atherton "then transferred funds to [Kirschner] and Carl Nelson." J.A. 2974–2975.

By the time Amazon discovered the scheme, at least $7,025,486 in kickbacks had allegedly been paid to Nelson ($2,455,152), Kirschner ($2,524,652), and Christian ($2,045,682), either directly or through associated entities. Nelson's and Kirschner's shell companies retained an additional $3,310,886 for their benefit. Atherton and his associated entities received $869,033. Watson personally received $5 million from the White Peaks transaction, on top of Northstar's substantial revenue.

Amazon worked with IPI Partners LLC, the private equity investor that had helped Northstar fund the leasing transactions, to terminate Northstar from the leasing projects. Amazon and IPI later renegotiated the leases to remove terms tainted by the kickback scheme, which Amazon says has reduced its costs.

F.

Amazon sued the defendants in the Eastern District of Virginia and obtained a preliminary injunction to protect evidence and prevent asset dissipation, which this Court affirmed on appeal. *See Amazon.com, Inc. v. WDC Holdings LLC*, No. 20-1743, 2021 WL 3878403 (4th Cir. Aug. 31, 2021). The operative complaint alleges violations of the Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1962, and claims under Virginia law for detinue, fraud, tortious interference, civil conspiracy, breach of contract, unjust enrichment, and conversion.

9

After discovery, the defendants moved for summary judgment. The district court ruled that Amazon's tortious interference claim should go to trial because "a reasonable juror could conclude that the Watson Defendants interfered with Nelson's and Casey Kirschner's employment relationships by bribing them and thereby depriving Amazon of its employees' honest services." *Amazon.com, Inc. v. WDC Holdings LLC*, No. 1:20-cv-484, 2023 WL 2815140, at *12 (E.D. Va. Apr. 6, 2023). The court also denied summary judgment on the civil conspiracy claim, except as to Atherton, who the court reasoned could not have conspired with his clients as a matter of law. Otherwise, the district court granted the motion for summary judgment in full, entering judgment for the defendants on Amazon's RICO, fraud, breach of contract, detinue, unjust enrichment, and conversion claims.

The district court directed the entry of final judgment on all the rejected claims pursuant to Federal Rule of Civil Procedure 54(b).[2] Amazon appealed as to five claims: RICO, fraud, unjust enrichment, conversion, and Atherton's liability for civil conspiracy. This Court has jurisdiction. *See* 28 U.S.C. § 1291.

## II.

"We review a district court's decision to grant summary judgment de novo, applying the same legal standards as the district court, and viewing all facts and reasonable inferences therefrom in the light most favorable to the nonmoving party." *Carter v.*

---

[2] This includes the civil conspiracy claim against Atherton, although that claim remains pending in the district court against other defendants. The summary judgment ruling disposed of all claims against Atherton, and Rule 54(b) authorizes the district court to enter final judgment as to "claims or parties." Fed. R. Civ. P. 54(b).

*Fleming*, 879 F.3d 132, 139 (4th Cir. 2018).  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

### III.

We first consider Amazon's RICO claim.  The district court concluded that the summary judgment record provided no basis for finding the existence of a RICO enterprise or for finding that Amazon was injured in its business or property.  We address these two elements in turn.

### A.

Amazon alleges violations of all four subsections of 18 U.S.C. § 1962, each of which forbids certain conduct with respect to an "enterprise engaged in, or the activities of which affect, interstate or foreign commerce."  An "'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  *Id.* § 1961(4).  "This enumeration of included enterprises is obviously broad, encompassing '*any* . . . group of individuals associated in fact.'"  *Boyle v. United States*, 556 U.S. 938, 944 (2009) (quoting 18 U.S.C. § 1961(4)); *see also Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 257 (1994) ("RICO broadly defines 'enterprise.'").  "[T]he very concept of an association in

11

fact is expansive," and "[t]he term 'any' ensures that the definition has a wide reach." *Boyle*, 556 U.S. at 944.[3]

The Supreme Court has "cautioned . . . against reading the term 'enterprise' too narrowly." *United States v. Palacios*, 677 F.3d 234, 249 (4th Cir. 2012) (citing *Boyle*, 556 U.S. at 948). Instead, the Court has explained that a RICO enterprise includes "a group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583 (1981). Such an enterprise "is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Id.* In particular, the Supreme Court has instructed that "an association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle*, 556 U.S. at 946.

In the case at hand, the district court concluded there could be no RICO enterprise because the facts "merely support a 'hub and spoke' or 'rimless wheel' structure to the alleged kickback scheme," which it considered a "dispositive" flaw. *Amazon.com*, 2023 WL 2815140, at *10–11. The "hub and spoke" or "rimless wheel" concept comes from traditional conspiracy law and is used to describe a situation "in which various defendants

---

[3] In addition, RICO instructs that its provisions should be "liberally construed to effectuate its remedial purposes." Pub. L. No. 91-452, § 904(a), 84 Stat. 922, 947 (1970) (note following 18 U.S.C. § 1961); *see Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497 (1985) ("RICO is to be read broadly."); *see also Russello v. United States*, 464 U.S. 16, 21 (1983) (noting "the pattern of the RICO statute in utilizing terms and concepts of breadth").

enter into separate agreements with a common defendant, but where the defendants have no connection with one another, other than the common defendant's involvement in each transaction." *Dickson v. Microsoft Corp.*, 309 F.3d 193, 203 (4th Cir. 2002). Such a structure "is not a single, general conspiracy but instead amounts to multiple conspiracies between the common defendant and each of the other defendants." *Id.*; *see id.* at 203–204 ("[A] wheel without a rim is not a single conspiracy.").

The district court's assessment is problematic both legally and factually. As a legal matter, traditional conspiracy law is not a sure guide for ascertaining the outer limit of what qualifies as a RICO association-in-fact enterprise. We have previously cautioned that although the "associated-in-fact RICO enterprise . . . shares important characteristics with the traditional conspiracy of criminal law," the "associated-in-fact enterprise is plainly intended to be something different and less difficult of proof." *United States v. Griffin*, 660 F.2d 996, 999–1000 (4th Cir. 1981). Indeed, "one of the avowed purposes of RICO was to relieve some of the deficiencies of the traditional conspiracy prosecution as a means for coping with contemporary organized crime." *Id.* at 999. As we have explained, the "complexity of 'organized' criminal activity," which can involve "highly diverse crimes [committed] by apparently unrelated individuals," "made it difficult to show the single agreement or common objective essential to proof of conspiracy." *Id.* "Congress attempted through RICO to relieve this problem by creating a new substantive offense, association in fact in an enterprise whose affairs are conducted through a pattern of racketeering activity . . . in which 'association' is presumably easier to prove than conspiracy." *Id.* (citing 18 U.S.C. § 1962(c)); *see also United States v. Elliott*, 571 F.2d

13

880, 902 (5th Cir. 1978) ("[T]hrough RICO, Congress . . . replac[ed] the inadequate 'wheel' and 'chain' rationales with a new statutory concept: the enterprise."); *cf. United States v. Fattah*, 914 F.3d 112, 165 (3d Cir. 2019) ("[T]he alleged lack of a unifying 'rim' is not fatal to this RICO enterprise.").  The district court limited its inquiry to whether Amazon could prove a traditional criminal conspiracy, and so its enterprise analysis was inevitably incomplete.

As a factual matter, the district court overlooked the connections among the defendants across multiple transactions, from which a reasonable jury could infer an association-in-fact enterprise.  Regarding *Boyle*'s first structural requirement, a jury could find the defendants shared the common purposes of making money from Amazon real estate deals procured through kickbacks and concealing the existence of those kickbacks. *Cf.*, *e.g.*, *United States v. Mathis*, 932 F.3d 242, 259 (4th Cir. 2019) ("common function and purpose . . . to enrich members . . . through the commission of violent crimes and selling drugs"); *United States v. Tillett*, 763 F.2d 628, 631 (4th Cir. 1985) (common purpose of "making money in the illegal trafficking of marijuana"); *United States v. Gross*, 199 Fed. App. 219, 235 (4th Cir. 2006) ("shared purpose of making money by illicit means, including . . . fraud"); *Fattah*, 914 F.3d at 164–167 (shared purposes included concealment).

Second, a jury could find the requisite "relationships among those associated with the enterprise."  *Boyle*, 556 U.S. at 946.  Beginning with the nine lease transactions, the personnel and structure of the fraud were identical for each one.  Nelson and Kirschner were the insiders, ensuring that Amazon approved the deals with Northstar.  Christian acted

14

as the middleman between the Amazon transaction managers and Northstar. Northstar was the counterparty that, under Watson's supervision, paid kickbacks from the Amazon funds it received to secure shared profits for all participants. And Atherton was the facilitator, laundering the proceeds so that Christian, Nelson, and Kirschner each received their cut.[4]

The membership and methods of the White Peaks transaction substantially overlapped with that of the lease transactions, even though some "faces in the group may have changed." *Tillett*, 763 F.2d at 631; *see also United States v. Pinson*, 860 F.3d 152, 162 (4th Cir. 2017) (asking whether "the four ventures" there involved similar "memberships, methods, and motives"). Kirschner and Nelson again supported the sale internally at Amazon, although Nelson was fired before the deal closed. This time the White Peaks entities, which were controlled by Northstar employees Ramstetter and Camenson, were the counterparties that paid kickbacks to secure shared profits. The kickbacks were funneled to Kirschner and Nelson through the 2010 Irrevocable Trust controlled by Atherton. And Watson, the CEO of Northstar, ultimately shared in the profits of the White Peaks transaction after he, Ramstetter, and Camenson agreed to keep their collective kickback transactions secret, including from Amazon.

The Blueridge transaction did not involve Northstar, but that change does not vitiate the existence of the enterprise or, at this stage, foreclose a jury from finding that the

---

[4] The defendants argue that Atherton could not participate in the enterprise because he merely provided legal services. This argument is raised solely in a footnote. "We do not ordinarily entertain arguments made solely in a footnote because they lack the development required by Federal Rule of Appellate Procedure 28." *United States v. Arbaugh*, 951 F.3d 167, 174 n.2 (4th Cir. 2020). That is the case here, so we adhere to our ordinary practice.

Blueridge transaction involved unlawful participation in the same enterprise. *See, e.g.,* *Tillett*, 763 F.2d at 631 (affirming the existence of an enterprise where "[t]here was both a continuity of structure and personality within the organization despite the change in financiers"). Kirschner and Nelson (before his departure) again designed the deal and supported it internally at Amazon. The kickback from Blueridge's developer went to the 2010 Irrevocable Trust under a purported "finder's fee" arrangement with Nelson. And Atherton again distributed the funds through the entities he created for the benefit of Nelson and Kirschner. These three central players participated in every transaction. The structure and purpose—to make money off Amazon through real estate deals procured through concealed kickbacks—remained the same across all the transactions as well. Viewing the evidence in the light most favorable to Amazon, a reasonable jury could find the relationships necessary for an association-in-fact enterprise.

Third, a jury could find the "longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle*, 556 U.S. at 946. Amazon has identified evidence that the enterprise began in 2017, when the kickback scheme was devised, and continued into early 2020, when the last of the eleven transactions closed and Amazon began unraveling the fraud. Based on this evidence, a reasonable jury could conclude that the alleged enterprise "function[ed] as a continuing unit and remain[ed] in existence long enough to pursue a course of conduct." *Id.* at 948.

The district court erred in concluding that Amazon could not prove the existence of an enterprise to support its RICO claim. Amazon's evidence suffices to demonstrate a

16

genuine dispute of material fact regarding the existence and contours of the alleged enterprise.[5]  Resolving that dispute is a job for the jury.

B.

The district court also held that Amazon's RICO claim failed because Amazon could not show that it suffered an injury to its business or property.  RICO's civil cause of action is available to "[a]ny person injured in his business or property by reason of a violation" of RICO's prohibitions.  18 U.S.C § 1964(c).  "A plaintiff has been 'injured in his business or property' if his business or property has been harmed or damaged." *Med. Marijuana, Inc. v. Horn*, 145 S. Ct. 931, 939 (2025).  The district court reasoned that Amazon could not prove "that the kickback payments . . . led to increased costs to Amazon on the lease transactions or the direct purchase transactions" because Amazon did not produce evidence "establishing the market value of the properties at the time of the lease and direct purchase transactions." *Amazon.com*, 2023 WL 2815140, at *10.

While the district court in this context rightly focused on whether Amazon could show financial harm from the defendants' scheme, it erred in concluding that Amazon did not produce evidence that the kickback payments led to increased costs for Amazon.  In particular, Amazon produced the report of its expert witness, Richard Lee, who opines,

---

[5] We note that Amazon's complaint asserts violations of 18 U.S.C. § 1962(a), (b), (c), *and* (d), the last of which prohibits conspiracy to violate RICO.  Therefore, some defendants may not be members of the enterprise and yet be liable.  "Outsiders who help the enterprise accomplish its illicit goals, thereby evidencing their agreement to advance the cause, are fully liable under § 1962(d)." *United States v. Cornell*, 780 F.3d 616, 631 (4th Cir. 2015); *see also Salinas v. United States*, 522 U.S. 52, 65 (1997) (observing that it can be "somewhat difficult to determine just where the enterprise ends and the conspiracy begins").

17

based on evidence in the record, that Amazon paid more in the lease and direct-purchase transactions than it would have absent the kickback scheme.[6]

Regarding the leases, Amazon contends that specific fees Northstar charged Amazon were directly tied to fees that Northstar paid the Villanova Trust to fund the kickbacks. Amazon's monthly rent was then calculated by multiplying lease expenses, including these fees, by the yield. Amazon's expert opines that, "[i]f the Scheme did not exist, Northstar could have charged lower development fees and leasing fees to the Landlord Entities and still netted the same profit because its net costs would have been lower by eliminating the portion of the fees paid to the Villanova Trust that were ultimately passed on to Carleton Nelson, Casey Kirschner, Kyle Ramstetter, and other Defendants." J.A. 2460. Because the fees "factored into Amazon's monthly rent," the expert says, "Amazon would have been able to negotiate for lower lease rates, and the overall lease

---

[6] Amazon also claimed harm from the rebates that were diverted to Northstar. The district court refused to consider this harm because Amazon did not identify the rebates as damages in its initial disclosures. *See Amazon.com*, 2023 WL 2815140, at *9 n.16. However, Amazon disclosed these damages in its expert report, and the record shows the defendants were well aware Amazon claimed the rebates as damages and even took discovery on the topic. *See* Fed. R. Civ. P. 26(e)(1) (authorizing supplemental disclosures "during the discovery process"); *Silicon Knights, Inc. v. Epic Games, Inc.*, No. 5:07-cv-275, 2012 WL 1596722, at *1 (E.D.N.C. May 7, 2012) ("[A] party may supplement its Rule 26(a)(1)(A)(iii) 'computation' by producing an expert report . . . that complies with [the] Rule . . . ."). Amazon's subsequent disclosure therefore rendered harmless its initial failure to itemize the rebates as damages. *See* Fed. R. Civ. P. 37(c)(1) (authorizing a court to exclude evidence not disclosed as required by Rule 26 "unless the failure was . . . harmless"); *see also S. States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 596 (4th Cir. 2003) (listing factors to consider in determining whether nondisclosure was harmless). Accordingly, the district court abused its discretion by precluding Amazon from claiming the rebates as damages. The rebates are an additional genuinely disputed injury to Amazon.

18

budget and Amazon's rent would have been lower, had the portion of Northstar's fees paid to Villanova Trust been eliminated." J.A. 2460.

As for the direct-purchase transactions, Amazon's expert concludes that "Amazon paid inflated purchase prices for the Blueridge Transaction and White Peaks Transaction, of which certain funds benefited the Defendants." J.A. 2460. Specifically, Amazon highlights evidence that a percentage of the assignment fee Amazon paid for the Blueridge property was secretly earmarked for Nelson and Kirschner and that millions of dollars from the White Peaks transaction profits went to Nelson, Kirschner, and Watson. Based on evidence in the record, Amazon's expert opines that Amazon would not have paid these inflated amounts absent the kickback scheme and therefore "suffered actual economic harm" as a result of the scheme. J.A. 2466.

In the district court's view, Amazon could prove that it overpaid only by first "establishing the market value of the properties." *Amazon.com*, 2023 WL 2815140, at \*10. We disagree. Amazon has produced sufficient expert evidence from which a jury could conclude that it paid more for these properties than it would have paid absent the kickback scheme. Proof that Amazon paid above-market prices isn't necessary to create a genuine dispute about whether Amazon overpaid.[7] Summary judgment, therefore, was not appropriate.

---

[7] That's not to say that market value is irrelevant. In deciding whether Amazon overpaid, the jury may consider the absence of evidence concerning the market value of the properties.

19

IV.

We next consider Amazon's fraud claim.[8]  As with the RICO claim, the district

court considered it "fatal to [Amazon's] fraud claim" that the company failed "to put forth

any evidence concerning the [market] value of the properties at the time each transaction

closed." *Amazon.com*, 2023 WL 2815140, at \*11.

Under Virginia law, "resulting damage to the party misled" is a necessary element

of a fraud claim. *Evaluation Rsch. Corp. v. Alequin*, 439 S.E.2d 387, 390 (Va. 1994).

"[T]here is no damage where the position of the complaining party is no worse than it

would be had the alleged fraud not been committed." *Cmty. Bank v. Wright*, 267 S.E.2d

158, 160 (Va. 1980) (internal quotation marks omitted); *see also Murray v. Hadid*, 385

S.E.2d 898, 904 (Va. 1989).

Relying on cases about undisclosed defects in property, the district court held that

the only proper measure of damages was "'the difference between the actual value of the

property at the time the contract was made and the value that the property would have

possessed had the [fraudulent] representation been true.'"  *Amazon.com*, 2023 WL

2815140, at \*11 (quoting *Klaiber v. Freemason Assocs., Inc.*, 587 S.E.2d 555, 558–559

(Va. 2003)).  Those cases are inapposite because Amazon does not allege defects in the

data center properties but, rather, undisclosed kickbacks in the contracts that allegedly

increased Amazon's purchase prices and rent payments.  As previously explained, Amazon

has produced evidence creating a genuine dispute about whether it paid more for the

---

[8] Contrary to the defendants' representations, Amazon did not concede its fraud claim in the district court.

20

properties than it would have paid "had the alleged fraud not been committed." *Cmty. Bank*, 267 S.E.2d at 160 (internal quotation marks omitted). That suffices under Virginia law.

V.

Next we turn to Amazon's claims of conversion and unjust enrichment. The district court entered summary judgment for the defendants on these claims not because of any defect in the evidence but because Amazon "has an adequate remedy at law." *Amazon.com*, 2023 WL 2815140, at *17. With respect to conversion, the court concluded that Amazon could not obtain a constructive trust because damages are an available remedy. Regarding unjust enrichment, the district court reasoned that "Amazon affirmed the leases at issue" and the existence of those contracts "precludes a recovery for unjust enrichment." *Id.* at *18. The district court erred.

First, the possibility that Amazon might win damages at trial does not defeat the pre-trial viability of its equitable claims. As this Court observed in the prior appeal, Amazon is entitled to pursue legal and equitable remedies in the alternative. *See Amazon.com*, 2021 WL 3878403, at *6. It may "pursue [these] alternative remedies . . . to a late stage of the action—after the proof is in or even after the fact-finder, court or jury, has made its findings on both alternatives." *United Roasters, Inc. v. Colgate-Palmolive Co.*, 649 F.2d 985, 990 (4th Cir. 1981) (internal quotation marks omitted); *see Homeland Training Ctr., LLC v. Summit Point Auto. Rsch. Ctr.*, 594 F.3d 285, 293 (4th Cir. 2010) ("[A] conclusive election [of remedies] typically is made only where a suit has advanced to judgment."); *Williams Elecs. Games, Inc. v. Garrity*, 366 F.3d 569, 576, 578 (7th Cir.

21

2004) (explaining that "[t]he victim of commercial bribery" "could seek (legal) damages from a jury and then, if it thought it could obtain a larger recovery by way of restitution, an order of restitution from the judge, since equitable remedies are determined by judges rather than by juries," and keep "the larger of the two").

Second, the affirmed leases do not foreclose Amazon's unjust enrichment claim. A contract "between the parties" and "covering the same subject matter" of their dispute "precludes a claim for unjust enrichment." *CGI Fed. Inc. v. FCi Fed., Inc.*, 814 S.E.2d 183, 190 (Va. 2018). However, as we observed in the prior appeal, "Amazon's unjust enrichment claims are not confined to the contracts governing the lease agreements" but instead "take aim at Northstar's broader scheme to acquire Amazon's business and thereby generate illicit profits." *Amazon.com*, 2021 WL 3878403, at *5; *cf. James G. Davis Constr. Corp. v. FTJ, Inc.*, 841 S.E.2d 642, 648 (Va. 2020) (observing that a contract would not preclude an unjust enrichment claim alleging that the fees charged were illegal). The district court brushed off our prior ruling on the ground that "the facts have changed significantly" since that decision because "Amazon entered into the Lease Continuity Agreement, thereby affirming the lease contracts, in February 2022." *Amazon.com*, 2023 WL 2815140, at *18. But in fact, Amazon entered the Lease Continuity Agreement in February 2020, before our prior decision. And as we observed then, the Lease Continuity Agreement was between Amazon and IPI, not any defendants—in other words, that agreement was not "between the parties" to this dispute. *CGI Fed.*, 814 S.E.2d at 190. In December 2021, moreover, Amazon and IPI agreed to amended leases, which removed the terms allegedly infected by the kickback scheme.

22

Furthermore, the district court's "affirmation" rationale ignores the direct-purchase transactions. The court granted summary judgment on the unjust enrichment claim in its entirety, but there is no alleged affirmation with respect to the White Peaks or Blueridge transactions.

For these reasons, summary judgment on the conversion and unjust enrichment claims must also be reversed.[9]

## VI.

Lastly, we address Amazon's civil conspiracy claim. The district court ruled that the civil conspiracy claim could proceed against all the defendants except Atherton, with tortious interference as the underlying wrong. The court granted summary judgment in Atherton's favor on this claim, reasoning that he could not have conspired with Nelson and Kirschner because he "was acting in a representative capacity when he created corporate entities and trusts for [their] benefit" and "there is no evidence" that he "formed an agreement with the Watson Defendants to interfere with Amazon's employment relationships" with Nelson and Kirschner. *Amazon.com*, 2023 WL 2815140, at *16. Again, we disagree.[10]

---

[9] In a two-sentence footnote, the defendants assert without elaboration three reasons Atherton should not be liable on the equitable claims. As before, we decline to consider these undeveloped arguments raised solely in a footnote. *See Arbaugh*, 951 F.3d at 174 n.2.

[10] Contrary to the defendants' representations, Amazon did not concede this point in the district court.

23

It is well settled that "a single entity cannot conspire with itself." *Fox v. Deese*, 362 S.E.2d 699, 708 (Va. 1987). "[A] principal and an agent are not separate persons" for these purposes, therefore a conspiracy solely between a principal and an agent is a "legal impossibility." *Charles E. Brauer Co. v. NationsBank of Va.*, 466 S.E.2d 382, 387 (Va. 1996); *see also Perk v. Vector Res. Grp., Ltd.*, 485 S.E.2d 140, 144 (Va. 1997). This general rule applies only if the agent is acting within the scope of the principal-agent relationship. *See Fox*, 362 S.E.2d at 708. And when "a third party" outside that relationship is involved in the conspiracy, the single-entity rule presents no bar to liability. *Bowman v. State Bank of Keysville*, 331 S.E.2d 797, 801 (Va. 1985); *see, e.g.*, *Blackburn v. A.C. Israel Enters.*, No. 3:22-cv-146, 2023 WL 4710884, at *32 (E.D. Va. July 24, 2023) (finding the single-entity rule irrelevant because the alleged conspiracy "reaches far beyond [the parent company] and its affiliated entities").

Evidence in the record creates a genuine dispute about two material facts: whether Atherton conspired with third parties who were not his clients, and whether Atherton was acting within the scope of the legal representation when he created the corporate entities and trusts for Nelson and Kirschner. First, there is a disputed question about whether Atherton conspired with non-clients to interfere with Nelson's and Kirschner's employment relationships with Amazon. Atherton testified in his deposition that he set up the Villanova Trust on Christian's behalf in 2017, *before* he represented Nelson and Kirschner for the first time in 2018. And evidence of Atherton's interactions with Watson and Northstar supports a genuine dispute about whether he conspired with them.

24

Second, it is a disputed question whether Atherton's work setting up corporate entities and trusts for Nelson and Kirschner, and transferring funds to those entities, was within his role as their attorney or beyond the scope of his legal representation. A lawyer may not "assist a client[] in conduct that the lawyer knows is criminal or fraudulent." Model Rules of Pro. Conduct r. 1.2(d) (Am. Bar Ass'n 2023). Doing so is beyond the scope of the attorney-client relationship. A lawyer who knowingly assists a client in fraudulent conduct has instead "turn[ed] himself into a coconspirator." *United States v. Farrell*, 921 F.3d 116, 139 (4th Cir. 2019). In an engagement letter to Kirschner and Nelson, Atherton acknowledged that "[p]ersonal gain by virtue of a complex structure like I have assisted you in creating may meet" the definition of "occupational fraud." J.A. 7681. This evidence creates a genuine factual dispute about whether Atherton knew that Nelson's and Kirschner's conduct was fraudulent and, consequently, whether he acted within the scope of the legal representation when he created the corporate entities and trusts for their benefit and transferred money to those entities.

Given the presence of these material factual disputes, the district court erred in granting summary judgment for Atherton on Amazon's civil conspiracy claim.

## VII.

For the foregoing reasons, we reverse the district court's judgment in favor of the defendants on Amazon's RICO, fraud, unjust enrichment, conversion, and civil conspiracy claims. The case is remanded for further proceedings consistent with this opinion.

*REVERSED AND REMANDED*

25